David & Louise ZARIN

v.

COMMISSIONER OF INTERNAL REVENUE.

Appeal of David ZARIN and Louise Zarin.

No. 90–1240.

United States Court of Appeals, Third Circuit.

Argued Aug. 20, 1990.

Decided Oct. 10, 1990.

William M. Goldstein (argued), Theodore P. Seto, Drinker, Biddle & Reath, Philadelphia, Pa., for appellants.

Bruce Ellisen (argued), Gary R. Allen, U.S. Dept. of Justice, Tax Div., Washington, D.C., for appellee.

Before STAPLETON, COWEN and WEIS, Circuit Judges.

OPINION OF THE COURT

COWEN, Circuit Judge.

David Zarin ("Zarin") appeals from a decision of the Tax Court holding that he recognized $2,935,000 of income from discharge of indebtedness resulting from his gambling activities, and that he should be taxed on the income.[1] This Court has jurisdiction to review the Tax Court's decision under section 7482 of the Internal Revenue Code (1954) (the "Code"). After considering the issues raised by this appeal, we will reverse.

## I.

Zarin was a professional engineer who participated in the development, construction, and management of various housing projects. A resident of Atlantic City, New Jersey, Zarin occasionally gambled, both in his hometown and in other places where gambling was legalized. To facilitate his gaming activities in Atlantic City, Zarin applied to Resorts International Hotel ("Resorts") for a credit line in June, 1978. Following a credit check, Resorts granted Zarin $10,000 of credit. Pursuant to this credit arrangement with Resorts, Zarin could write a check, called a marker,[2] and in return receive chips, which could then be used to gamble at the casino's tables.

Before long, Zarin developed a reputation as an extravagant "high roller" who routinely bet the house maximum while playing craps, his game of choice. Considered a "valued gaming patron" by Resorts, Zarin had his credit limit increased at

---

1. David Zarin's wife, Louise, is also a party to this appeal, since she filed a joint return with her husband. When the term "Zarin" is used in this opinion, however, it will refer only to David Zarin.

2. A "marker" is a negotiable draft payable to Resorts and drawn on the maker's bank.

regular intervals without any further credit checks, and was provided a number of complimentary services and privileges. By November, 1979, Zarin's permanent line of credit had been raised to $200,000. Between June, 1978, and December, 1979, Zarin lost $2,500,000 at the craps table, losses he paid in full.

Responding to allegations of credit abuses, the New Jersey Division of Gaming Enforcement filed with the New Jersey Casino Control Commission a complaint against Resorts. Among the 809 violations of casino regulations alleged in the complaint of October, 1979, were 100 pertaining to Zarin. Subsequently, a Casino Control Commissioner issued an Emergency Order, the effect of which was to make further extensions of credit to Zarin illegal.

Nevertheless, Resorts continued to extend Zarin's credit limit through the use of two different practices: "considered cleared" credit and "this trip only" credit.[3] Both methods effectively ignored the Emergency Order and were later found to be illegal.[4]

By January, 1980, Zarin was gambling compulsively and uncontrollably at Resorts, spending as many as sixteen hours a day at the craps table.[5] During April, 1980, Resorts again increased Zarin's credit line without further inquiries. That same month, Zarin delivered personal checks and counterchecks to Resorts which were returned as having been drawn against insufficient funds. Those dishonored checks totaled $3,435,000. In late April, Resorts cut off Zarin's credit.

Although Zarin indicated that he would repay those obligations, Resorts filed a New Jersey state court action against Za-

rin in November, 1980, to collect the $3,435,000. Zarin denied liability on grounds that Resort's claim was unenforceable under New Jersey regulations intended to protect compulsive gamblers. Ten months later, in September, 1981, Resorts and Zarin settled their dispute for a total of $500,000.

The Commissioner of Internal Revenue ("Commissioner") subsequently determined deficiencies in Zarin's federal income taxes for 1980 and 1981, arguing that Zarin recognized $3,435,000 of income in 1980 from larceny by trick and deception. After Zarin challenged that claim by filing a Tax Court petition, the Commissioner abandoned his 1980 claim, and argued instead that Zarin had recognized $2,935,000 of income in 1981 from the cancellation of indebtedness which resulted from the settlement with Resorts.

Agreeing with the Commissioner, the Tax Court decided, eleven judges to eight, that Zarin had indeed recognized $2,935,000 of income from the discharge of indebtedness, namely the difference between the original $3,435,000 "debt" and the $500,000 settlement. *Zarin v. Commissioner,* 92 T.C. 1084 (1989). Since he was in the seventy percent tax bracket, Zarin's deficiency for 1981 was calculated to be $2,047,245. With interest to April 5, 1990, Zarin allegedly owes the Internal Revenue Service $5,209,033.96 in additional taxes. Zarin appeals the order of the Tax Court.

## II.

The sole issue before this Court is whether the Tax Court correctly held that Zarin had income from discharge of indebtedness.[6] Section 108 and section 61(a)(12) of

3. Under the "considered cleared" method, Resorts would treat a personal check as a cash transaction, and would therefore not apply the amount of the check in calculating the amount of credit extended Zarin. "This trip only" credit allowed Resorts to grant temporary increases of credit for a given visit, so long as the credit limit was lowered by the next visit.

4. On July 8, 1983, the New Jersey Casino Control Commission found that Resorts violated the Emergency Order at least thirteen different

times, nine involving Zarin, and fined Resorts $130,000.

5. Zarin claims that at the time he was suffering from a recognized emotional disorder that caused him to gamble compulsively.

6. Subsequent to the Tax Court's decision, Zarin filed a motion to reconsider, arguing that he was insolvent at the time Resorts forgave his debt, and thus, under I.R.C. section 108(a)(1)(B), could not have income from discharge of indebtedness. He did, not, however,

the Code set forth "the general rule that gross income includes income from the discharge of indebtedness." I.R.C. § 108(e)(1). The Commissioner argues, and the Tax Court agreed, that pursuant to the Code, Zarin did indeed recognize income from discharge of gambling indebtedness.

Under the Commissioner's logic, Resorts advanced Zarin $3,435,000 worth of chips, chips being the functional equivalent of cash. At that time, the chips were not treated as income, since Zarin recognized an obligation of repayment. In other words, Resorts made Zarin a tax-free loan. However, a taxpayer does recognize income if a loan owed to another party is cancelled, in whole or in part. I.R.C. §§ 61(a)(12), 108(e). The settlement between Zarin and Resorts, claims the Commissioner, fits neatly into the cancellation of indebtedness provisions in the Code. Zarin owed $3,435,000, paid $500,000, with the difference constituting income. Although initially persuasive, the Commissioner's position is nonetheless flawed for two reasons.

### III.

Initially, we find that sections 108 and 61(a)(12) are inapplicable to the Zarin/Resorts transaction. Section 61 does not define indebtedness. On the other hand, section 108(d)(1), which repeats and further elaborates on the rule in section 61(a)(12), defines the term as any indebtedness "(A) for which the taxpayer is liable, or (B) subject to which the taxpayer holds property." I.R.C. § 108(d)(1). In order to bring the taxpayer within the sweep of the discharge of indebtedness rules, then, the IRS must show that one of the two prongs in the section 108(d)(1) test is satisfied. It has not been demonstrated that Zarin satisfies either.

Because the debt Zarin owed to Resorts was unenforceable as a matter of New Jersey state law,[7] it is clearly not a debt "for which the taxpayer is liable." I.R.C. § 108(d)(1)(A). Liability implies a legally enforceable obligation to repay, and under New Jersey law, Zarin would have no such obligation.

Moreover, Zarin did not have a debt subject to which he held property as required by section 108(d)(1)(B). Zarin's indebtedness arose out of his acquisition of gambling chips. The Tax Court held that gambling chips were not property, but rather, "a medium of exchange within the Resorts casino" and a "substitute for cash." Alternatively, the Tax Court viewed the chips as nothing more than "the opportunity to gamble and incidental services ..." *Zarin*, 92 T.C. at 1099. We agree with the gist of these characterizations, and hold that gambling chips are merely an accounting mechanism to evidence debt.

raise that issue before the Tax Court until after it rendered its decision. The Tax Court denied the motion for reconsideration. By reason of our resolution of this case, we do not need to decide whether the Tax Court abused its discretion in denying Zarin's motion.

7. The Tax Court held that the Commissioner had not met its burden of proving that the debt owed Resorts was enforceable as a matter of state law. *Zarin*, 92 T.C. at 1090. There was ample evidence to support that finding. In New Jersey, the extension of credit by casinos "to enable [any] person to take part in gaming activity as a player" is limited. N.J.Stat.Ann. § 5:12–101(b) (1988). Under N.J.Stat.Ann. § 5:12–101(f), any credit violation is "invalid and unenforceable for the purposes of collection ..." In *Resorts Int'l Hotel, Inc. v. Salomone,* 178 N.J.Super. 598, 429 A.2d 1078 (App. Div.1981), the court held that "casinos must comply with the Legislature's strict control of

credit for gambling purposes. Unless they do, the debts reflected by players' checks will not be enforced...." *Id.* at 607, 429 A.2d at 1082.

With regards to the extension of credit to Zarin after the Emergency Order of October, 1979, was issued, Resorts did not comply with New Jersey regulations. The Casino Control Commission specifically stated in 1983 "that Resorts was guilty of infractions, violations, improprieties, with the net effect that [Zarin] was encouraged to continue gambling long after, one, his credit line was reached, and exceeded; two, long after it became apparent that the gambler was an addicted gambler; three, long after the gambler had difficulty in paying his debts; and four, Resorts knew the individual was gambling when he should not have been gambling." Appendix at 325–326. It follows, therefore, that under New Jersey law, the $3,435,000 debt Zarin owed Resorts was totally unenforceable.

Gaming chips in New Jersey during 1980 were regarded "solely as evidence of a debt owed to their custodian by the casino licensee and shall be considered at no time the property of anyone other than the casino licensee issuing them." N.J.Admin.Code tit. 19k, § 19:46–1.5(d) (1990). Thus, under New Jersey state law, gambling chips were Resorts' property until transferred to Zarin in exchange for the markers, at which point the chips became "evidence" of indebtedness (and not the property of Zarin).

Even were there no relevant legislative pronouncement on which to rely, simple common sense would lead to the conclusion that chips were not property in Zarin's hands. Zarin could not do with the chips as he pleased, nor did the chips have any independent economic value beyond the casino. The chips themselves were of little use to Zarin, other than as a means of facilitating gambling. They could not have been used outside the casino. They could have been used to purchase services and privileges within the casino, including food, drink, entertainment, and lodging, but Zarin would not have utilized them as such, since he received those services from Resorts on a complimentary basis. In short, the chips had no economic substance.

Although the Tax Court found that theoretically, Zarin could have redeemed the chips he received on credit for cash and walked out of the casino, *Zarin*, 92 T.C. at 1092, the reality of the situation was quite different. Realistically, before cashing in his chips, Zarin would have been required to pay his outstanding IOUs. New Jersey state law requires casinos to "request patrons to apply any chips or plaques in their possession in reduction of personal checks

or Counter Checks exchanged for purposes of gaming prior to exchanging such chips or plaques for cash or prior to departing from the casino area." N.J.Admin.Code tit. 19k, § 19:45–1.24(s) (1979) (currently N.J.Admin.Code tit. 19k, § 19:45–1.25(o) (1990) (as amended)). Since his debt at all times equalled or exceeded the number of chips he possessed, redemption would have left Zarin with no chips, no cash, and certainly nothing which could have been characterized as property.

Not only were the chips non-property in Zarin's hands, but upon transfer to Zarin, the chips also ceased to be the property of Resorts. Since the chips were in the possession of another party, Resorts could no longer do with the chips as it pleased, and could no longer control the chips' use. Generally, at the time of a transfer, the party in possession of the chips can gamble with them, use them for services, cash them in, or walk out of the casino with them as an Atlantic City souvenir. The chips therefore become nothing more than an accounting mechanism, or evidence of a debt, designed to facilitate gambling in casinos where the use of actual money was forbidden.[8] Thus, the chips which Zarin held were not property within the meaning of I.R.C. § 108(d)(1)(B).[9]

In short, because Zarin was not liable on the debt he allegedly owed Resorts, and because Zarin did not hold "property" subject to that debt, the cancellation of indebtedness provisions of the Code do not apply to the settlement between Resorts and Zarin. As such, Zarin cannot have income from the discharge of his debt.

8. Although, as noted above, Zarin would not have been able to leave the casino with cash or chips, and probably would not have used the chips for services, these facts do not change the character of the chips. Despite the aforementioned limitations upon Zarin's use of the chips, they remain an accounting mechanism or evidence of a debt. Resorts' increased interest in Zarin's chips does not rise to the level of a property interest, since Zarin still has dominion over the chips within the casino.

9. The parties stipulated before the Tax Court that New Jersey casino "chips are property

which are not negotiable and may not be used to gamble or for any other purpose outside the casino where they were issued." It could be argued that we are bound by this stipulation to accept the proposition that chips are property. We do not dispute the notion that chips are property, but as discussed above, they are only property in the hands of the casino. The stipulation is consistent with this idea. In fact, both parties agreed in their briefs that chips are property of the casino. Moreover, during oral arguments, both parties agreed that chips were not property when held by the gambler.

## IV.

■ Instead of analyzing the transaction at issue as cancelled debt, we believe the proper approach is to view it as disputed debt or contested liability. Under the contested liability doctrine, if a taxpayer, in good faith, disputed the amount of a debt, a subsequent settlement of the dispute would be treated as the amount of debt cognizable for tax purposes. The excess of the original debt over the amount determined to have been due is disregarded for both loss and debt accounting purposes. Thus, if a taxpayer took out a loan for $10,000, refused in good faith to pay the full $10,000 back, and then reached an agreement with the lendor that he would pay back only $7000 in full satisfaction of the debt, the transaction would be treated as if the initial loan was $7000. When the taxpayer tenders the $7000 payment, he will have been deemed to have paid the full amount of the initially disputed debt. Accordingly, there is no tax consequence to the taxpayer upon payment.

The seminal "contested liability" case is *N. Sobel, Inc. v. Commissioner*, 40 B.T.A. 1263 (1939). In *Sobel*, the taxpayer exchanged a $21,700 note for 100 shares of stock from a bank. In the following year, the taxpayer sued the bank for recision, arguing that the bank loan was violative of state law, and moreover, that the bank had failed to perform certain promises. The parties eventually settled the case in 1935, with the taxpayer agreeing to pay half of the face amount of the note. In the year of the settlement, the taxpayer claimed the amount paid as a loss. The Commissioner denied the loss because it had been sustained five years earlier, and further asserted that the taxpayer recognized income from the discharge of half of his indebtedness.

The Board of Tax Appeals held that since the loss was not fixed until the dispute was settled, the loss was recognized in 1935, the year of the settlement, and the deduction was appropriately taken in that year. Ad-

ditionally, the Board held that the portion of the note forgiven by the bank "was not the occasion for a freeing of assets and that there was no gain ..." *Id.* at 1265. Therefore, the taxpayer did not have any income from cancellation of indebtedness.

There is little difference between the present case and *Sobel*. Zarin incurred a $3,435,000 debt while gambling at Resorts, but in court, disputed liability on the basis of unenforceability. A settlement of $500,-000 was eventually agreed upon. It follows from *Sobel* that the settlement served only to fix the amount of debt. No income was realized or recognized. When Zarin paid the $500,000, any tax consequence dissolved.[10]

Only one other court has addressed a case factually similar to the one before us. In *United States v. Hall*, 307 F.2d 238 (10th Cir.1962), the taxpayer owed an unenforceable gambling debt alleged to be $225,000. Subsequently, the taxpayer and the creditor settled for $150,000. The taxpayer then transferred cattle valued at $148,110 to his creditor in satisfaction of the settlement agreement. A jury held that the parties fixed the debt at $150,000, and that the taxpayer recognized income from cancellation of indebtedness equal to the difference between the $150,000 and the $148,110 value affixed to the cattle. Arguing that the taxpayer recognized income equal to the difference between $225,000 and $148,000, the Commissioner appealed.

The Tenth Circuit rejected the idea that the taxpayer had any income from cancellation of indebtedness. Noting that the gambling debt was unenforceable, the Tenth Circuit said, "The cold fact is that taxpayer suffered a substantial loss from gambling, the amount of which was determined by the transfer." *Id.* at 241. In effect, the Court held that because the debt was unenforceable, the amount of the loss and resulting debt cognizable for tax purposes were fixed by the settlement at $148,110. Thus, the Tenth Circuit lent its endorse-

---

**10.** Had Zarin not paid the $500,000 dollar settlement, it would be likely that he would have had income from cancellation of indebtedness. The

debt at that point would have been fixed, and Zarin would have been legally obligated to pay it.

ment to the contested liability doctrine in a factual situation strikingly similar to the one at issue.[11]

The Commissioner argues that *Sobel* and the contested liability doctrine only apply when there is an unliquidated debt; that is, a debt for which the amount cannot be determined. *See Colonial Sav. Ass'n v. Commissioner*, 85 T.C. 855, 862–863 (1985) (*Sobel* stands for the proposition that "there must be a liquidated debt"), *aff'd*, 854 F.2d 1001 (7th Cir.1988). *See also N. Sobel, Inc. v. Commissioner*, 40 B.T.A. at 1265 (there was a dispute as to "liability and the amount" of the debt). Since Zarin contested his liability based on the unenforceability of the entire debt, and did not dispute the amount of the debt, the Commissioner would have us adopt the reasoning of the Tax Court, which found that Zarin's debt was liquidated, therefore barring the application of *Sobel* and the contested liability doctrine. *Zarin*, 92 T.C. at 1095 (Zarin's debt "was a liquidated amount" and "[t]here is no dispute about the amount [received].").

We reject the Tax Court's rationale. When a debt is unenforceable, it follows that the amount of the debt, and not just the liability thereon, is in dispute. Although a debt may be unenforceable, there still could be some value attached to its worth. This is especially so with regards to gambling debts. In most states, gambling debts are unenforceable, and have "but slight potential ..." *United States v. Hall*, 307 F.2d 238, 241 (10th Cir.1962). Nevertheless, they are often collected, at least in part. For example, Resorts is not a charity; it would not have extended illegal credit to Zarin and others if it did not

have some hope of collecting debts incurred pursuant to the grant of credit.

Moreover, the debt is frequently incurred to acquire gambling chips, and not money. Although casinos attach a dollar value to each chip, that value, unlike money's, is not beyond dispute, particularly given the illegality of gambling debts in the first place. This proposition is supported by the facts of the present case. Resorts gave Zarin $3.4 million dollars of chips in exchange for markers evidencing Zarin's debt. If indeed the only issue was the enforceabilty of the entire debt, there would have been no settlement. Zarin would have owed all or nothing. Instead, the parties attached a value to the debt considerably lower than its face value. In other words, the parties agreed that given the circumstances surrounding Zarin's gambling spree, the chips he acquired might not have been worth $3.4 million dollars, but were worth something. Such a debt cannot be called liquidated, since its exact amount was not fixed until settlement.

To summarize, the transaction between Zarin and Resorts can best be characterized as a disputed debt, or contested liability. Zarin owed an unenforceable debt of $3,435,000 to Resorts. After Zarin in good faith disputed his obligation to repay the debt, the parties settled for $500,000, which Zarin paid. That $500,000 settlement fixed the amount of loss and the amount of debt cognizable for tax purposes. Since Zarin was deemed to have owed $500,000, and since he paid Resorts $500,000, no adverse tax consequences attached to Zarin as a result.[12]

---

**11.** The Commissioner argues that the decision in *Hall* was based on United States Supreme Court precedent since overruled, and therefore *Hall* should be disregarded. Indeed, the *Hall* court devoted a considerable amount of time to *Bowers v. Kerbaugh–Empire Co.*, 271 U.S. 170, 46 S.Ct. 449, 70 L.Ed. 886 (1926), a case whose validity is in question. We do not pass on the question of whether or not *Bowers* is good law. We do note that *Hall* relied on *Bowers* only for the proposition that "'a court need not in every case be oblivious to the net effect of the entire transaction.'" *United States v. Hall*, 307 F.2d at 242, *quoting Bradford v. Commissioner*, 233 F.2d 935, 939 (6th Cir.1956). *Hall's* reliance on *Bow-*

ers did not extend to the issue of contested liability, and even if it did, the idea that "Courts need not apply mechanical standards which smother the reality of a particular transaction," *Id.* at 241, is hardly an exceptional concept in the tax realm. *See Commissioner v. Tufts*, 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983); *Hillsboro Nat'l Bank v. Commissioner*, 460 U.S. 370, 103 S.Ct. 1134, 75 L.Ed.2d 130 (1983).

**12.** The Commissioner argues in the alternative that Zarin recognized $3,435,000 of income in 1980. This claim has no merit. Recognition of income would depend upon a finding that Zarin

## V.

In conclusion, we hold that Zarin did not have any income from cancellation of indebtedness for two reasons. First, the Code provisions covering discharge of debt are inapplicable since the definitional requirement in I.R.C. section 108(d)(1) was not met. Second, the settlement of Zarin's gambling debts was a contested liability. We reverse the decision of the Tax Court and remand with instructions to enter judgment that Zarin realized no income by reason of his settlement with Resorts.

STAPLETON, Circuit Judge, dissenting.

I respectfully dissent because I agree with the Commissioner's appraisal of the economic realities of this matter.

Resorts sells for cash the exhilaration and the potential for profit inherent in games of chance. It does so by selling for cash chips that entitle the holder to gamble at its casino. Zarin, like thousands of others, wished to purchase what Resorts was offering in the marketplace. He chose to make this purchase on credit and executed notes evidencing his obligation to repay the funds that were advanced to him by Resorts. As in most purchase money transactions, Resorts skipped the step of giving Zarin cash that he would only return to it in order to pay for the opportunity to gamble. Resorts provided him instead with chips that entitled him to participate in Resorts' games of chance on the same basis as others who had paid cash for that privilege.[1] Whether viewed as a one or two-step transaction, however, Zarin received either $3.4 million in cash or an entitlement for which others would have had to pay $3.4 million.

Despite the fact that Zarin received in 1980 cash or an entitlement worth $3.4 million, he correctly reported in that year no income from his dealings with Resorts. He did so *solely* because he recognized, as evidenced by his notes, an offsetting obligation to repay Resorts $3.4 million in cash. *See, e.g., Vukasovich, Inc. v. Commissioner,* 790 F.2d 1409 (9th Cir.1986); *United States v. Rochelle,* 384 F.2d 748 (5th Cir.1967), *cert. denied,* 390 U.S. 946, 88 S.Ct. 1032, 19 L.Ed.2d 1135 (1968); Bittker and Thompson, *Income From the Discharged Indebtedness: The Progeny of United States v. Kirby Lumber Co.,* 66 Calif.L.Rev. 159 (1978). In 1981, with the delivery of Zarin's promise to pay Resorts $500,000 and the execution of a release by Resorts, Resorts surrendered its claim to repayment of the remaining $2.9 million of the money Zarin had borrowed. As of that time, Zarin's assets were freed of his potential liability for that amount and he recognized gross income in that amount. *Commissioner v. Tufts,* 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983); *United States v. Kirby Lumber Company,* 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131 (1931); *Vukasovich, Inc. v. Commissioner,* 790 F.2d 1409 (9th Cir.1986). *But see United States v. Hall,* 307 F.2d 238 (10th Cir. 1962).[2]

did not have cancellation of indebtedness income solely because his debt was unenforceable. We do not so hold. Although unenforceability is a factor in our analysis, our decision ultimately hinges upon the determination that the "disputed debt" rule applied, or alternatively, that chips are not property within the meaning of I.R.C. section 108.

1. I view as irrelevant the facts that Resorts advanced credit to Zarin solely to enable him to patronize its casino and that the chips could not be used elsewhere or for other purposes. When one buys a sofa from the furniture store on credit, the fact that the proprietor would not have advanced the credit for a different purpose does not entitle one to a tax-free gain in the event the debt to the store is extinguished for some reason.

2. This is not a case in which parties agree subsequent to a purchase money transaction that the property purchased has a value less than thought at the time of the transaction. In such cases, the purchase price adjustment rule is applied and the agreed-upon value is accepted as the value of the benefit received by the purchaser; *see e.g., Commissioner v. Sherman,* 135 F.2d 68 (6th Cir.1943); *N. Sobel, Inc. v. Commissioner,* 40 B.T.A. 1263 (1939). Nor is this a case in which the taxpayer is entitled to rescind an entire purchase money transaction, thereby to restore itself to the position it occupied before receiving anything of commercial value. In this case, the illegality was in the extension of credit by Resorts and whether one views the benefit received by Zarin as cash or the opportunity to gamble, he is no longer in a position to return that benefit.

The only alternatives I see to this conclusion are to hold either (1) that Zarin realized $3.4 million in income in 1980 at a time when both parties to the transaction thought there was an offsetting obligation to repay or (2) that the $3.4 million benefit sought and received by Zarin is not taxable at all. I find the latter alternative unacceptable as inconsistent with the fundamental principle of the Code that anything of commercial value received by a taxpayer is taxable unless expressly excluded from gross income.[3] *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483 (1955); *United States v. Kirby Lumber Co., supra.* I find the former alternative unacceptable as impracticable. In 1980, neither party was maintaining that the debt was unenforceable and, because of the settlement, its unenforceability was not even established in the litigation over the debt in 1981. It was not until 1989 in this litigation over the tax consequences of the transaction that the unenforceability was first judicially declared. Rather than require such tax litigation to resolve the correct treatment of a debt transaction, I regard it as far preferable to have the tax consequences turn on the manner in which the debt is treated by the parties. For present purposes, it will suffice to say that where something that would otherwise be includable in gross income is received on credit in a purchase money transaction, there should be no recognition of income so long as the debtor continues to recognize an obligation to repay the debt. On the other hand, income, if not earlier recognized, should be recognized when the debt-

or no longer recognizes an obligation to repay and the creditor has released the debt or acknowledged its unenforceability.[4]

In this view, it makes no difference whether the extinguishment of the creditor's claim comes as a part of a compromise. Resorts settled for 14 cents on the dollar presumably because it viewed such a settlement as reflective of the odds that the debt would be held to be enforceable. While Zarin should be given credit for the fact that he had to pay 14 cents for a release, I see no reason why he should not realize gain in the same manner as he would have if Resorts had concluded on its own that the debt was legally unenforceable and had written it off as uncollectible.[5]

I would affirm the judgment of the Tax Court.

---

**3.** As the court's opinion correctly points out, this record will not support an exclusion under § 108(a) which relates to discharge of debt in an insolvency or bankruptcy context. Section 108(e)(5) of the Code, which excludes discharged indebtedness arising from a "purchase price adjustment" is not applicable here. Among other things, § 108(e)(5) necessarily applies only to a situation in which the debtor still holds the property acquired in the purchase money transaction. Equally irrelevant is § 108(d)'s definition of "indebtedness" relied upon heavily by the court. Section 108(d) expressly defines that term solely for the purposes of § 108 and not for the purposes of § 61(a)(12).

**4.** *Cf. Bear Manufacturing Co. v. United States*, 430 F.2d 152 (7th Cir.1970) (termination of a liability for tax purposes turns not on running of applicable statute of limitations, but on conduct of the parties), *cert. denied*, 400 U.S. 1021, 91 S.Ct. 583, 27 L.Ed.2d 632 (1971).

**5.** A different situation exists where there is a bona fide dispute over the amount of a debt and the dispute is compromised. Rather than require tax litigation to determine the amount of income received, the Commission treats the compromise figure as representing the amount of the obligation. I find this sensible and consistent with the pragmatic approach I would take.