CRABTREE, J.T.C.
This is a gross income tax case wherein plaintiffs[1] seek review of defendant’s partial denial of their claim for refund of gross income tax for 1986.
The issues are:
1. Whether the amounts involved in the release of certain obligations constitute discharge of indebtedness income (DOI) or whether such amounts are includible in the amount realized upon the sale of certain real property in determining taxable gain for purposes of N.J.S.A 54A:5-l(e).
2. Whether, if the court finds the release of such obligations to be includible in the amount realized, the basis of the property sold should be adjusted by reason of plaintiffs’ inability to derive a tax benefit from depreciation allowances applicable to prior years.
All the facts have been stipulated except for the evidence pertaining to the execution and release of the second mortgage note.
At all times pertinent hereto, plaintiff owned a 25% limited partnership interest in Wallis Ridgeland Associates, Ltd. (WRAL), a Texas limited partnership with its principal office in New York City.
In 1984, WRAL purchased a 99% limited partnership interest in each of two Texas limited partnerships based in New York City: Vance Wallis Associates, Ltd. (“Wallis”) and Vance Ridgeland *227 Associates, Ltd. (“Ridgeland”). In the same year Wallis and Ridgeland acquired leasehold and fee interests in certain commercial real estate. Wallis acquired property in Louisiana; Ridgeland acquired property in Mississippi.
Wallis paid $5,781,381 for its Louisiana property, financing the acquisition with nonrecourse loans from institutional lenders secured by first mortgages and an assignment of rents. Wallis also issued a nonrecourse note for $1,070,000 secured by a second mortgage on the Louisiana property to the corporate manager of WRAL purportedly in consideration for an assignment of the right to purchase the Louisiana property.
Ridgeland purchased a D.H. Holmes Co. department store located in a Ridgeland, Mississippi shopping center for $6,050,000. D.H. Holmes is a Louisiana corporation which owns and operates a chain of department stores in Louisiana, Mississippi and other States of the Deep South. The purchase was financed by a first mortgage loan granted by Bankers Life Co. for $5,950,000 and an unsecured purchase money note for $100,000 given to the seller. In addition, Ridgeland executed a nonrecourse promissory note for $1,041,000, secured by a second mortgage on the property, purportedly in consideration for the assignment of the right to purchase the property. The note and mortgage (which was never recorded) were given to Vance Capital Corporation (Vance Capital), the corporate manager of Ridgeland, the assignor of the right to purchase the property.
The conveyance was followed immediately by the execution of a 20-year net lease between the purchaser, Ridgeland, and D.H. Holmes Co. as lessee. The term of the lease coincided with the amortization period of the first mortgage note.
Testimony at the trial by Robert F. Gossett, Jr., the managing director and principal shareholder of Vance Capital, disclosed that the second mortgage on the Mississippi property was, in reality, Vance Capital’s syndication fee for putting the sale-leaseback transaction together and marketing partnership interests in WRAL to outside investors. Gossett felt that, without additional equity investment, the deal was not viable.
*228 Wallis continued its activity concerning the Louisiana property until July 1985, at which time it sold the property and discontinued its real estate operation. Ridgeland continued its real estate operation in Mississippi throughout 1985.
Plaintiff had no partnership income from any source unrelated to his interest in WRAL in any of the years 1984, 1985 and 1986. In each of those years plaintiff sustained a net loss from his investment in WRAL. In view of the prohibition in N.J.S.A 54A:5-2 against netting of intereategory income and losses, plaintiff derived no New Jersey tax benefit from his distributive share of WRAL’s losses in 1984 and 1985.
Gossett testified that the assembly of the two tax shelters for Wallis and Ridgeland, using WRAL as the primary investment vehicle, coincided with the announcement by the Reagan Administration of the proposed Tax Reform Act, which was ultimately enacted in October 1986. That legislation sounded the death knell for tax shelters, as it contained a provision denying deductions for so-called passive activity losses to the extent they exceeded passive activity income. As partnership interests in WRAL would fit the proposed statutory definition of passive activities, Gossett was unable to market those interests. As indicated above, further equity investment in WRAL was essential to the viability of the tax shelter transactions. Consequently, the sale-leaseback deal between D.H. Holmes and Ridgeland, although consummated, was aborted. In December 1986, Ridgeland reconveyed the Mississippi property to D.H. Holmes, the consideration for which was the latter’s assumption of the first mortgage on a recourse basis. Contemporaneously with the reconveyance, Ridgeland’s liability for the unsecured purchase money note to D.H. Holmes was released. At the same time, according to Gossett’s testimony, Vance Capital surrendered its claim to the syndication fee, an action which took the form of a release of the unrecorded second mortgage and note. Gossett testified that he felt impelled to relinquish Vance Capital’s claim, no part of which had been paid, because of his inability to market interests in WRAL.
*229 The assumption and cancellation agreement of December 1, 1986, whereby D.H. Holmes reacquired the Mississippi property from Ridgeland, refers to the assumption by D.H. Holmes of the first mortgage and its undertaking to be personally liable on the first mortgage note. There is no reference in that agreement to the second mortgage nor to the unsecured purchase money note.
Ridgeland’s 1986 Federal return (Form 1065) reported a net gain from the sale of its Mississippi property of $1,179,471 and DOI income of $405,267. The adjusted basis of the property for Federal income tax purposes was reported as $5,899,550 (original cost of $7,091,000 minus accumulated depreciation of $1,191,450). The amount realized was reported as $7,145,377.
Ridgeland’s income and expenses for 1984, 1985 and 1986 were as follows:
1984 1985 1986*
Rents $178,022 $ 327J3275 $420^88
Ground rent (5,250) (10,000) (10,000)
Depreciation (198,704) (556,433) (436,313)
Interest[2] (381,950) (902,544) (9,479)
Net income (loss) ($407,882) ($1,141,352) ($ 35,504)
Wallis’ income and expenses for 1984 and 1985 were as follows:
1984 1985**
Interest income $34,449 —0—
Ground rent (2,000) —0—
Mise, expense (381) Interest expense (46,932) (27,143) (766,163)
(refer to footnote # 2) Depreciation (134,322)
Net income (loss) ($14,864) ($927,628)
*230 Plaintiff’s 1986 New Jersey gross income tax return reported $24,249 as a distributive share of partnership income from WRAL. The return also reported plaintiffs distributive share of a section 1231 gain realized by WRAL, “net of unused losses” in the sum of $2,171. These items were composed of the following:
(1) ordinary loss ($ 6,441)
(2) interest expense (2,346)
(3) DOI income 100,304
(4) carryover of investment
interest expense (67,268)
$ 24,249
Distributive share of net partnership income $383,436 [3]
Carryover of distributive share of 1984 partnership loss (102,459)
Carryover of distributive share of 1985 partnership loss (278,806)
$ 2,171
Plaintiffs claimed a refund of $14,129. Defendant determined an overpayment of $1,457, which, after an offset for unpaid tax for 1985, resulted in a refund of $993.51. In calculating the overpay *231 ment of $1,457, defendant increased plaintiffs partnership income from $24,249 to $91,517, disallowing the carryover deduction for investment interest expense. The reported section 1231 gain of $2,171 was increased to $291,919; the carryover losses from prior years were disallowed. The DOI income as reported by plaintiffs was not disturbed. That income was derived from interest on the second mortgage accrued and deducted, but not paid, in 1984 and 1985.
Plaintiffs do not dispute the disallowance of interest and loss carryovers; defendant concedes that DOI income is not taxable under the New Jersey Gross Income Tax Act. Plaintiffs contend, however, that the only consideration for the 1986 sale to D.H. Holmes was the latter’s assumption of the first mortgage in the sum of $5,950,000. Thus, the argument goes, Ridgeland incorrectly reported the amount realized on the sale as $7,145,377, when the amount should have been $5,950,000. The difference of $1,195,377, by process of elimination, represents the principal and accrued interest on the second mortgage and the unsecured purchase money note, which, plaintiffs contend, should be treated as DOI income. (The amount actually reported as DOI income, $405,267, was the interest previously accrued and deducted, but unpaid, on the second mortgage note and purchase money note. Interest on the first mortgage note was paid currently.) If this adjustment proposed by plaintiffs is made, Ridgeland’s reported gain of $1,179,471 is transformed into a loss of $15,906 ($1,179,471 - $1,195,377 = ($15,906)). Thus, plaintiffs distributive share of Ridgeland’s reported gain ($291,919) is completely eliminated from plaintiffs’ New Jersey taxable income for 1986.
If the release of the second mortgage and purchase money note constitute DOI income, those obligations are not subject to the New Jersey gross income tax. If, however, those obligations are to be included in the amount realized on the sale to D.H. Holmes, then they are taxable as part of the gain realized on the sale within the purview of N.J.S.A. 54A:5-l(c). That statute also mandates the use of the basis employed for Federal income tax purposes in determining the gain.
*232 When property is sold subject to a mortgage which may or may not be assumed by the purchaser, the amount of the mortgage is includible in the amount realized for federal income tax purposes. Crane v. Commissioner of Internal Revenue, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947). Personal liability on the mortgage note is irrelevant; the amount of the mortgage is includible in the amount realized whether the mortgage is recourse or nonrecourse. Commissioner of Internal Revenue v. Tufts, 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983). The Supreme Court in both Crane and Tufts reasoned that, as the mortgages were includible in the original cost basis of the property, which was the basis for annual depreciation allowances as well as the basis (adjusted for depreciation) for determining gain or loss upon a sale of the property, symmetry demanded that the balance of the mortgages be includible in the amount realized when the property was sold.
On the other hand, when a mortgage, be it recourse or nonrecourse, is simply released independently of the disposition of the collateral, discharge of indebtedness income is recognized. Gershkowitz v. Commissioner, 88 TC 984, 1987 WL 49310 (1987). Discharge of indebtedness is income subject to tax under the Internal Revenue Code. See section 61(a)(12). In Rev.Rul. 91-31, CB 1991-1,19 the Internal Revenue Service ruled that the partial release of a nonrecourse mortgage unrelated to the disposition of the collateral resulted in DOI income subject to tax under section 61(a)(12), not a reduction in basis. Implicit in this Ruling is the determination that, as DOI income is a taxable event, basis in the property encumbered by the mortgage is unaffected.
The requirement of N.J.S.A. 54A:5-l(e) that federal basis be used in determining gain taxable under that statute leads to an examination of section 108(e)(5) of the Internal Revenue Code. That section provides:
(5) PURCHASE—MONEY DEBT REDUCTION FOR SOLVENT DEBTOR TREATED AS PRICE REDUCTION.—If—
(A) The debt of a purchaser of property to the seller of such property which arose out of the purchase of such property is reduced,
*233 (B) such reduction does not occur—
(i) in a title 11 case, or
(ii) when the purchaser is insolvent, and
(C) but for this paragraph, such reduction would be treated as income to the purchaser from the discharge of indebtedness, then such reduction shall be treated as a purchase price adjustment.
This statute fits the purchase money note transaction like a glove. The debt underlying the note arose from Ridgeland’s purchase from D.H. Holmes; the debt was released, i.e., reduced in statutory parlance; the reduction (release) did not occur in a bankruptcy case; nothing in the record indicates that Ridgeland was insolvent when the note was released; and the release would otherwise constitute a discharge of indebtedness income within the purview of section 61(a)(12) of the Code. The release of an unsecured obligation, purchase-money or otherwise, is not governed by the principles of Crane or Tufts. Those cases deal with the disposition of indebtedness secured by property and the tax treatment of such indebtedness upon disposition of the collateral as part of the amount realized when the latter is sold, exchanged or otherwise disposed of.
Accordingly, the release of the purchase money note results in a reduction in Ridgeland’s basis in the Mississippi property for federal purposes and thus, for New Jersey gross income tax purposes as well.
The so-called second mortgage, given the circumstances of its creation and subsequent release, is neither includible in the amount realized nor does it constitute discharge of indebtedness income. Indeed, given the undisputed testimony of Gossett, the amount of the second mortgage does not even belong in the basis of the Mississippi property.
According to his testimony, which the court finds, to be credible, the mortgage note of $1,041,000 represented a syndication fee payable to Vance Capital for putting the tax shelter together and marketing the sale of interests in the WRAL partnership, which was the investment vehicle for the tax shelters incorporated in the Wallis and Ridgeland partnerships.
*234 A syndication expense is defined in Treas.Reg. § 1.709-2(b) as follows:
Syndication expenses are expenses connected with the issuing and marketing of interests in the partnership. Examples of syndication expenses are brokerage fees; registration fees; legal fees of the underwriter or placement agent and the issuer (the general partner or the partnership) for securities advice and for advice pertaining to the adequacy of tax disclosures in the prospectus or placement memorandum for securities law purposes____ These expenses are not subject to the election under section 709(b) and must be capitalized.[4]
It is important to note that, under the quoted Regulation, syndication refers to issuing and marketing of partnership interests; it has nothing to do with the basis in partnership property. This case does not involve the basis of plaintiffs partnership interest in WRAL; it involves the basis of property owned by the Ridgedale partnership.
As for the discharge of indebtedness issue, the cases make it abundantly clear that the treatment of indebtedness discharge as taxable income under § 61(a)(12) of the Code depends upon the existence of a legally enforceable obligation in the first instance. Zarin v. Comm’r of Internal Revenue, 916 F.2d 110 (3rd Cir.1990), rev’g, 92 TC 1084 (1989). Furthermore, the debt must actually exist; its potential existence is insufficient. See Estate of Franklin v. Comm’r of Internal Revenue, 544 F.2d 1045, 1049 (9th Cir.1976), aff'g, 64 TC 752, 1975 WL 3035 (1975).[5]
In this ease the credible, uncontroverted testimony of Gossett indicates that the syndication fee, in the guise of a second mortgage, was nothing more than a unilateral contract, to become binding and enforceable only upon performance of the services represented by the fee. As indicated above, announcement of the proposed Tax Reform Act of 1986 nullified Gossett’s efforts to *235 market the sale of interests in WRAL. As a consequence, Gossett surrendered his corporation’s right to the fee which was never earned.
Accordingly, no debt ever existed and there can be no taxable discharge of a non-existent debt.
Plaintiffs argue that, if the court finds that the balance of principal and interest on the second mortgage and the purchase money note are includible in the amount realized, then plaintiffs are entitled to an adjustment in basis to account for depreciation allowances from which, because of partnership losses, plaintiffs derived no tax benefit. The court’s treatment of the second mortgage and purchase money note leaves defendant’s determination undisturbed,[6] so the court will address plaintiffs’ contentions concerning the tax benefit rule.
Defendant, while conceding in principle the application of the tax benefit rule to the New Jersey gross income tax, contends that it does not apply in this ease.
The tax benefit rule is a judicially developed doctrine under federal law, ultimately codified in the Internal Revenue Code in §§ 111 and 1016(a)(2). Section 111 provides, pertinently:
(a) DEDUCTIONS.—gross income does not include income attributable to the recovery during the taxable year of any amount deducted in any prior taxable year to the extent such amount did not reduce the amount of tax imposed by this chapter.
The substance of the rule, prior to its codification, was stated in Dobson v. Commissioner, 46 BTA 770 (1942), rev’d sub nom., Harwick v. Commissioner, 133 F.2d 732 (8th Cir.), rev’d sub nom., Dobson v. Commissioner, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248 (1943):
Where there is recovery in respect of a loss sustained in an earlier year and a deduction of such loss claimed and allowed for the earlier year had effected an *236 offset in taxable income, the amount recovered in the latter year should be included in taxable income for the year of recovery, [because] the prior deduction of the amount of the loss out of taxable income and the subsequent recovery, being in the nature of a replacement of taxable income, is equivalent to gain to the taxpayer. [46 B.T.A. at 773-74]
More recently, the United States Supreme Court held in Hillsboro National Bank v. Commissioner, 460 U.S. 370, 103 S.Ct. 1134, 75 L.Ed.2d 130 (1983) that the purpose of the tax benefit rule “is to approximate the results produced by a tax system based on transactional rather than annual accounting.” 460 U.S. at 380, 103 S.Ct. at 1142. The Court went on to declare:
The basic purpose of the tax benefit rule is to achieve rough transactional parity in tax ... and to protect the Government and the taxpayer from the adverse effects of reporting a transaction on the basis of assumptions that an event in a subsequent year proves to have been erroneous. [Id. at 383, 103 S.Ct. at 1143]
The Court dealt with section 111 in the following manner:
Finally, Justice Stevens’ dissent relies heavily on the codification in § 111 of the exclusionary aspect of the tax benefit rule, which requires the taxpayer to include in income only the amount of the deduction that gave rise to a tax benefit____ The provision does, as the dissent observes, speak of a “recovery.” [7] By its terms, it only applies to bad debts, taxes, and delinquency amounts. Yet this Court has held, Dobson v. Commissioner, 320 U.S. 489, 505-506, 64 S.Ct. 239, 248, 88 L.Ed. 248 (1943), and it has always been accepted since, that § 111 does not limit the application of the exclusionary aspect of the tax benefit rule. On the contrary, it lists a few applications and represents a general endorsement of the exclusionary aspect of the tax benefit rule to other situations within the inclusionary part of the rule. The failure to mention inconsistent events in § 111 no more suggests that they do not trigger the application of the tax benefit rule that the failure to mention the recovery of a capital loss suggests that it does not, see Dobson, supra. [Id. 460 U.S. at 388, 103 S.Ct. at 1145]
It is apparent that the tax benefit rule was, and continues to be, a judicially developed doctrine quite apart from the enactment of section 111. However, neither section 111 nor any of the decided cases deals with the tax benefit rule in the context of depreciation deductions and the effect thereof on the calculation of basis when *237 the property with respect to which those deductions were taken was sold. Congress has dealt with the tax benefit rule in this context in section 1016(a)(2) of the Internal Revenue Code. That section provides:
(a) General Rule—proper adjustment in respect of the property shall in all cases be made—
(2) in respect of any periods since February 28, 1913, for exhaustion, wear and tear, obsolescence, amortization, and depletion, to the extent of the amount—
(A) allowed as deductions in computing taxable income under this subtitle or prior income tax laws, and
(B) resulting (by reason of the deductions so allowed) in a reduction for any taxable year of the taxpayer’s taxes under this subtitle ..., but not less than the amount allowable under this subtitle or prior income tax laws, (emphasis supplied.)
Treas.Reg. § 1.1016-3(b) provides, in pertinent part:
... the decrease I in basis] required by paragraph (a) of this section ... for [depreciation] deductions ... shall be whichever is the greater of the following amounts:
(1) the amount allowed as deductions in computing taxable income ... and resulting (by reason of the deductions so allowed) in a reduction for any taxable year of the taxpayer’s taxes under subtitle A of the Code ... or prior income, war-profits or excess profits tax laws; or
(2) the amount properly allowable as deductions in computing taxable income under Subtitle A of the Code or prior income tax laws (whether or not the amount properly allowable would have caused a reduction for any taxable year of the taxpayer’s taxes). (emphasis supplied.)
The amount allowable for tangible assets acquired after December 31, 1980 is precisely and definitively determinable under section 168, which introduced the accelerated cost recovery system (ACRS). Section 168(a) provides that the depreciation deduction provided by section 167 for any tangible property must be determined by using the applicable depreciation method, the applicable recovery period and the applicable convention, as those terms are defined in § 168.
Exercising an option available under § 168(b)(3), (5), Ridgeland depreciated its real property on a 15-year straight line basis. Ridgeland depreciated its personal property over five years in accordance with an ACRS depreciation schedule set forth in Prop.Reg. § 1.168-2(b)(l).
*238 Thus, if the Federal rules are followed, basis is unaffected by the absence of a tax benefit from depreciation deductions in 1984, 1985 and 1986, as the deductions claimed were equivalent to the amount allowable as determined under § 168.
While, to be sure, the Internal Revenue Code and the New Jersey Gross Income Tax Act are fundamentally disparate statutes, the Legislature has explicitly incorporated certain federal income tax concepts. See Smith v. Director, Div. of Taxation, 108 N.J. 19, 32-33, 527 A.2d 843 (1987). For example, N.J.S.A 54A:5-1(b) provides that net profits from business be determined “in accordance with the method of accounting allowed for federal income tax purposes.” N.J.SA 54A:5-1(c) provides that “[t]he term ‘net gains or net income’ shall not include gains or income from transactions to the extent to which nonrecognition is allowed for federal income tax purposes.” Most significantly, N.J.SA 54A:5-1(c) also provides that “[f]or the purpose of determining gain or loss, the basis of property shall be the adjusted basis used for federal income tax purposes.” In this case, federal income tax basis in Ridgeland’s Mississippi property would have been reduced by allowable depreciation even if such depreciation produced no federal income tax benefit.[8]
The use of federal income tax basis, as required by N.J.SA 54A:5-l(e), reflects (1) the application of the ACRS rules, ie., the mandatory use of allowable depreciation and (2) the *239 reduction of basis by allowable depreciation irrespective of any tax benefit associated with depreciation deductions. There is no warrant for an adjustment in that basis in plaintiffs’ favor on the ground that depreciation deductions in 1984 and 1985 were “wasted,” ie., they produced no tax benefit. Plaintiffs, in effect, are asking for a benefit under the New Jersey Qross Income Tax Act that would not be available under the Internal Revenue Code, even if the prior depreciation deductions taken by Ridgeland had produced no tax benefit.
Plaintiffs argue that Walsh v. Division of Taxation, 10 N.J.Tax 447 (1989), aff'd per curiam, 240 N.J.Super. 42, 572 A.2d 222 (App.Div.1990) is authority for the application of the tax benefit rule to increase Ridgeland’s basis by the amount of depreciation deductions claimed in 1984, 1985 and 1986 from which plaintiffs derived no tax benefit. In Walsh, this court held that reductions in the federal income tax basis of subchapter S stock, arising from losses and other deductions passed through the subchapter S corporations to their shareholders would be ignored in determining basis under N.J.S.A. 54A:5-1(c), as New Jersey law does not recognize subchapter S corporations.
This court, however, reads Walsh to stand for the proposition that federal basis will be modified for New Jersey gross income tax purposes where the Internal Revenue Code provides for adjustments that are not recognized under New Jersey law. Also, as defendant points out, the tax benefit associated with depreciation deductions in years prior to the sale was not unavailable as a matter of law; it was unavailable because Ridgeland sustained losses. Had Ridgeland operated at a profit in those years, plaintiffs would have derived a tax benefit from their distributive share of the depreciation deductions, ie., their New Jersey gross income tax would have been less. Furthermore, even if Ridgeland passed losses through to plaintiffs, those losses could have been offset against income from other partnerships to the extent that depreciation allowances were included in plaintiffs’ distributive share of Ridgeland’s losses, plaintiffs would have derived a tax benefit from their distributive share of Ridgeland’s losses.
*240 Moreover, the concern expressed by Judge Lasser in Walsh (10 N.J.Tax at 462-68, 572 A.2d 222) that use of Federal adjusted basis in a situation where New Jersey does not recognize the transactions producing the adjustments results in a tax on capital is inapplicable to the case under review. The transactions in Walsh involved a sale of stock in subchapter S corporations. The basis of plaintiffs partnership interest in WRAL is not before this court; the transaction in issue involves a sale of partnership property, not the sale of an interest in the partnership. Thus, the issue of tax on capital simply does not arise.[9]
Finally, plaintiffs argue that this court can fashion its own tax benefit rule to address the alleged inequities of the Gross Income Tax Act. The difficulty with this position is that plaintiffs cannot establish that the tax is structurally unfair as applied to partners generally or as applied to Mr. Vasudev in particular. The fact that the tax could achieve a fairer result should not impel this court to formulate a new equitable doctrine not grounded firmly in the federal tax benefit rule. As the United States Supreme Court made clear in Hillsboro National Bank v. Commissioner, 460 U.S. 370, 103 S.Ct. 1134, 75 L.Ed.2d 130 (1983), the federal rule is a technical one, not a broad grant of authority to achieve an equitable result. (In a related area, this court has refused to apply the doctrine of equitable recoupment where the facts of the case did not fit the technical requirements of the doctrine as formulated by federal courts. Superior Air Products International, Inc. v. Taxation Div. Director, 9 N.J.Tax 463, 474-77 (1988).)
The adoption of a perduring rule which would increase federal basis whenever prior years’ depreciation allowances produced no tax benefit would not correct an alleged inequity. Rather, it would confer an unjustified advantage not available under *241 federal law. The limitation of a tax benefit for “wasted” depreciation allowances to the excess of the amount of depreciation “allowed” over the amount allowable as provided in section 1016(a)(2) had no effect when losses in passive activities could be applied against income from other sources. With the passage of the Tax Reform Act of 1986, however, which added section 469 to the Code, passive activity losses may only offset passive activity income. (Section 469 is the approximate equivalent of N.J.S.A. 54A:5-2, which prohibits netting of intercategory income and losses.) Thus, under both federal and New Jersey law depreciation allowances reduce basis irrespective of any tax benefit. Plaintiffs would have this court apply a preferential rule to give them relief not available under federal law. This the court simply declines to do.
The parties will submit computations pursuant to R. 8:9-3 to implement the judgment to be entered in accordance with this opinion.

 Hereinafter throughout this opinion, whenever the singular plaintiff is used it will refer to Jagdish Vasudev, the investor involved in the transactions to be described. Mona Vasudev is a party only because a joint return was filed.

 Sec. 1231 gain on the sale of the Mississippi property and DOI income are not included.

 Section 1231 loss and DOI income are not included.

 The interest is so-called "investment interest”, described in section 163(d) of the Code, which is passed through to the individual partners, who may deduct it with certain limitations.

 Plaintiff’s treatment of the items composing this amount is palpably erroneous. The distributive share of WRAL income consists of $291,919 of section 1231 gain, $100,304 of DOI income and $6,441 of ordinary loss, the latter two items being duplicative of two items utilized in calculating plaintiff's distributive share of ordinary income. As will be seen from defendant's adjustments and from the court’s analysis these mistakes, while initially confusing, are harmless.

 The election referred to under § 709(b), is an election to amortize organization expenses over not less than 60 months. The purpose of the quoted regulation is to distinguish between amortizable organization expenses and non-amortizable syndication expenses.

 The fact that the second mortgage note was nonrecourse would not of itself preclude treatment of its release as discharge of indebtedness income. See Rev.Rul. 91-31, supra.

 The defendant’s determination included the amount of the second mortgage as part of the amount realized. This court has eliminated the second mortgage from the amount realized but has also found that the second mortgage should be subtracted from basis. The effect of these two adjustments leaves the defendant’s determination undisturbed.

 Section 111(a) provided as follows during 1973, the year before the Court in Hillsboro: "Gross income does not include income attributable to the recovery during the taxable year of a bad debt, prior tax, or delinquency amount, to the extent of the amount of the recovery exclusion with respect to such debt, tax or amount.” "Recovery exclusion” was defined as the amount of a prior year’s deduction for a bad debt, tax or delinquency amount that produced no reduction in tax.

 Plaintiffs’ federal income tax returns for 1984 and 1985 indicate that plaintiffs derived a full tax benefit from their distributive share of Ridgeland’s losses, which include depreciation, in that they were able to offset such losses against income from other sources. Thus, in those years, the requirement of section 1016(a)(2) that basis be reduced by allowable depreciation regardless of tax benefit, was irrelevant. In years beginning after December 31, 1986, however, section 469, added to the Code by the Tax Reform Act of 1986, P.L. 99-514, prohibited netting of passive activity losses against income from other sources, so that depreciation allowances, to the extent they related to passive activity losses, could produce no tax benefit unless, and to the extent that, such losses were offset by income of another passive activity. The term "passive activity" is defined in section 469(c) as the conduct of a trade or business (including rental activity) in which the taxpayer does not materially participate. The term aptly describes Mr. Vasudev’s investment (through WRAL) in Ridgeland.

 In addition, it would appear that there can be no tax on capital in this case. The federal income tax returns in evidence indicate that plaintiff's cash capital investment of $ 18,000 in WRAL was fully recovered by the time of the sale of the Mississippi property in December 1986 through the tax benefits realized from the pass-through of Ridgeland's losses in 1984, 1985 and 1986.