A.C. MARCACCIO AND MARIA MARCACCIO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Marcaccio v. Commissioner
Docket No. 9511-92
United States Tax Court
T.C. Memo 1995-174; 1995 Tax Ct. Memo LEXIS 168; 69 T.C.M. (CCH) 2420; April 17, 1995, Filed *168 Decision will be entered for respondent. For petitioners: Edward M. Peine. For respondent: Susan Pinner. WHALEN
WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION WHALEN, Judge: Respondent determined a deficiency of $ 13,544 in petitioners' Federal income tax for 1988. The issue for decision is whether petitioners realized income in the amount of $ 31,675 from the discharge of indebtedness pursuant to section 61(a)(12), as determined by respondent. Unless stated otherwise, all section references are to the Internal Revenue Code as in effect during 1988. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are so found. The Stipulation of Facts filed by the parties and the attached exhibits are incorporated herein by this reference. Petitioners resided in Houston, Texas, at the time they filed their petition in this case. References to "petitioner" in this opinion are references to Dr. A.C. Marcaccio. In February 1984, petitioner and 11 other individuals formed Lakes of White Oak Joint Venture (White Oak) for the purpose of developing a parcel of real property located in Harris County, Texas (the Property). White Oak was a partnership for Federal tax *169 purposes, and petitioner was a general partner of White Oak with a 7.5-percent interest in its profits and losses. To finance its purchase of the Property, White Oak borrowed $ 2,980,000 from Heights State Bank on August 4, 1984. Throughout this opinion, Heights State Bank and its successors are referred to as the bank. As part of that loan transaction, White Oak executed a promissory note payable to the bank in the principal amount of $ 2,980,000 (the First Note). The bank secured the First Note with a Deed of Trust and Security Agreement on the Property. As additional collateral for the loan, the bank required each partner of White Oak to personally guarantee payment of a portion of the principal of the First Note. Petitioner executed a "GUARANTY AGREEMENT" in the amount of $ 336,000 on August 14, 1984 (the First Guaranty). The amount of the First Guaranty is approximately 150 percent of petitioner's share of the loan; i.e., 7.5 percent of the principal amount of the loan. The First Guaranty provides, in relevant part, as follows: Guarantor [petitioner] hereby unconditionally guarantees the prompt payment at maturity of the following (hereinafter called the "Indebtedness") *170 * * * All indebtedness obligations and liabilities of any kind of the Borrower [White Oak] to the Bank (and also to others to the extent of participations granted them by the Bank), now outstanding or owing or which may hereafter be executed or incurred, directly between the Borrower and the Bank or acquired outright, as a participation, conditionally or as collateral security from another by the Bank, absolute or contingent, joint and/or several, secured or unsecured, due or not due, arising by operation of law or otherwise, or direct or indirect, including indebtedness, obligations and liabilities to the Bank of Borrower as a member of any partnership * * * and whether incurred by the Borrower as principal, surety, endorser, guarantor, accommodation party or otherwise. Guarantor's liability hereunder is limited to $ 336,000, plus a proportionate amount of the interest, fees, charges and expenses comprising such indebtedness, obligations and liabilities which the amount of limited liability specified above bears to the total of such indebtedness, obligations and liabilities minus such interest, fees, charges and expenses.
In January 1986, White Oak borrowed an additional $ *171 300,000 from the bank for the purpose of financing the installation of utilities on the Property. As part of that loan transaction, White Oak executed a second promissory note payable to the bank in the principal amount of $ 300,000 (the Second Note). The bank secured this Second Note with a Deed of Trust and Security Agreement on the Property. As in the case of the First Note, the bank required each White Oak partner to personally guarantee payment of a portion of the principal amount of the Second Note. Petitioner executed a second "GUARANTY AGREEMENT" in January 1986 (the Second Guaranty). The Second Guaranty provides, in relevant part, as follows: Guarantor [petitioner] hereby unconditionally guarantees the prompt payment at maturity of the following (hereinafter called the "Indebtedness") * * * The following described Promissory Note executed by Borrower [White Oak] payable to the order of Bank (and also to the others to the extent of participations granted them by the bank) together with any and all renewals, extensions and/or rearrangements thereof, whether with or without notice to Guarantor: Date January 30, 1986 Amount $ 300,000 Maturity August 15, 1986 Guarantor's *172 liability hereunder is limited to $ 33,750.00, plus a proportionate amount of the interest, fees, charges and expenses comprising such indebtedness, obligations and liabilities which the amount of limited liability specified above bears to the total of such indebtedness, obligations, and liabilities minus such interest, fees, charges and expenses.
Thus, petitioner's liability to the bank under the Second Guaranty is limited to $ 33,750, plus his share of certain fees and expenses. Petitioner's maximum liability under the Second Guaranty is 150 percent of petitioner's share of the loan; i.e., 7.5 percent of the principal amount of the loan. White Oak was unable to develop the Property as planned. As a result, White Oak made only some of the interest payments required under the First Note, and none of the payments required under the Second Note. When the two notes matured on August 15, 1986, White Oak was in default. In October 1986, the bank demanded payment of the First Note. On October 13, 1986, the bank's attorneys, Bray, Mullins & Bray, sent a letter dated October 11, 1986, by certified mail to White Oak and to all of its partners. The letter notified each recipient *173 of the bank's intention to cause the trustee under the Deed of Trust to foreclose the bank's liens securing the First Note by selling the Property, unless White Oak paid the principal and accrued interest due under the First Note. White Oak failed to pay the First Note as demanded by the bank. Accordingly, the trustee sold the Property at public auction on November 4, 1986. The bank entered the high bid and purchased the Property for $ 2,441,000. At the time of the foreclosure sale, White Oak owed the bank $ 3,280,000, the sum of the principal amount of each of the two promissory notes discussed above; i.e., $ 2,980,000 and $ 300,000. Therefore, after the sale of the Property to the bank for $ 2,441,000, there remained a deficiency in the amount of $ 839,000 ($ 3,280,000 less $ 2,441,000). White Oak reported the deficiency on its 1986 Federal income tax return on Form 1065, U.S. Partnership Return of Income. Specifically, on line 18 of the balance sheet attached to the return as Schedule L, White Oak reported "Mortgages, notes, and bonds payable in 1 year or more" in the amount of $ 839,000. Furthermore, White Oak reported petitioner's share of the deficiency on the Schedule *174 K-1, Partner's Share of Income Credits, Deductions, etc., prepared for petitioner's interest in White Oak. Line B of the 1986 Schedule K-1 states as follows: Partner's share of liabilities
(Form 1065):
Nonrecourse
$ --.
Other
$ 62925.
Thus, White Oak reported that petitioner bore liability for 7.5 percent of the deficiency of $ 839,000 that arose from the foreclosure, or $ 62,925. White Oak's basis in the Property at the time of the foreclosure sale was $ 2,912,499. Therefore, based upon the sale price of the Property at the foreclosure sale, $ 2,441,000, White Oak realized a long-term capital loss in the amount of $ 471,499. White Oak reported this amount as a net long-term capital loss on Schedule D, Capital Gains and Losses, of its 1986 Form 1065. Line 5 of part II of Schedule D states that White Oak realized a net long-term capital loss of $ 471,499 when "Land and Improvements", which had been acquired on February 17, 1984, and in which the partnership had a cost or other basis of $ 2,912,499, were sold on November 4, 1986, for $ 2,441,000. On the Schedule K-1 for petitioner's interest in the partnership, White Oak reported 7.5 percent of the loss; i.e., $ 35,362, *175 as petitioner's distributive share of the capital loss, and it took the loss into account as a downward adjustment in computing petitioner's adjusted basis in the partnership. The Schedule K-1 also reports an ordinary loss of which petitioner's distributive share is $ 3,961. Petitioners' 1986 return includes a Schedule D, Capital Gains and Losses and Reconciliation of Forms 1099-B. Line 12 of petitioners' Schedule D reports a net long-term loss "from partnerships, S corporations, and fiduciaries" in the amount of $ 41,144. The $ 35,362 capital loss from White Oak is included in that amount. Petitioners also reported the $ 3,961 ordinary loss from White Oak on Schedule E of their 1986 return. In December 1987, petitioners filed a Form 1040X, Amended U.S. Individual Income Tax Return, with regard to their 1986 return. Among other differences, line 12 of the amended Schedule D reports a net long-term loss from "partnerships, S Corporations, and fiduciaries" of $ 37,783, rather than $ 41,144, the amount reported on the original return. The record does not disclose the nature of this difference, but the $ 35,362 capital loss from White Oak is included in the amount shown on the *176 amended return, $ 37,783. As in the case of the Schedule E filed with the original return, the Schedule E accompanying the amended return reports the $ 3,961 ordinary loss from White Oak. Several months after the foreclosure sale, the bank's attorneys wrote a letter dated June 19, 1987, addressed to White Oak and to eight of its partners, including petitioner. The letter was sent by certified mail. In the letter, the bank's attorneys state that the aggregate balance of the First and Second Notes, after crediting the proceeds of the foreclosure sale, is as follows: Interest
Through Principal 11-4-86 Total First note
$ 2,980,000.00 $ 146,410.00
$ 3,126,410.00 payment
(2,441,000.00)
--
(2,441,000.00)
Balance
539,000.00 146,410.00 685,410.00 Second note
300,000.00 12,397.41
312,397.41 payment
--
--
--
Balance
300,000.00 12,397.41
312,397.41
Aggregate balance
839,000.00 158,807.41
997,807.41
The attorneys' letter further states that, unless the bank received payment of "$ 997,807.50", plus interest, the attorneys would file suit for collection. In early 1988, the bank sued White Oak and 10 of its 12 partners, including *177 petitioner, to collect the $ 839,000 deficiency. The suit also sought collection from the partners under their guaranties. In relevant part, the complaint in that action states as follows: On or about August 14, 1984, Defendant A.C. MARCACCIO executed a Guaranty Agreement, a copy of which is attached hereto and labeled Exhibit "K" and made a part hereof for all purposes as if set forth at length herein, wherein he guaranteed the indebtedness of LAKES OF WHITE OAK JOINT VENTURE, limited to $ 336,000.00, plus a proportionate amount of interest, fees, charges and expenses comprising such indebtedness to Plaintiff. * * * As a result of Defendant LAKES OF WHITE OAK JOINT VENTURE's failure to pay the Note when due, Plaintiff called upon L. STEVE BRAY, Substitute Trustee, to proceed with the foreclosure sale in accordance with the terms of the Deed of Trust in Exhibit "B". The Trustee on the 13th day of October, 1986, posted Notices of Sale and forwarded a true copy by certified mail to Defendants. A true and correct copy of said Notice is attached as Exhibit "M" and incorporated by reference the same as if more fully copied and set forth at length herein. On the date stated in *178 said Notice, being November 4, 1986, the property described above was sold at public auction, and conducted by the Substitute Trustee at the door of the Courthouse of Harris County, Texas. The sales price received from the highest bidder, NBC BANK-HEIGHTS, was $ 2,441,000.00, and a Substitute Trustee's Deed was executed and delivered by the Substitute Trustee to the purchaser, a true and correct copy of which is attached as Exhibit "N" and incorporated by reference the same as if more fully copied and set forth at length herein. * * * On or about January 29, 1986, Defendant A.C. MARCACCIO executed a Guaranty Agreement, a copy of which is attached hereto and labeled Exhibit "V" and made a part hereof for all purposes as if set forth at length herein, wherein he guaranteed the indebtedness of LAKES OF WHITE OAK JOINT VENTURE, limited to $ 33,750.00, plus a proportionate amount of interest, fees, charges and expenses comprising such indebtedness to Plaintiff.
Petitioner never filed an answer to the bank's petition, and thus, petitioner never formally raised any defense to the bank's suit nor objected to any of the facts stated therein. Several partners of White Oak filed answers *179 to the bank's suit which pled certain affirmative defenses. In March 1988, after negotiations, petitioner and the bank agreed to settle the bank's suit against him. Under the terms of the settlement, petitioner agreed to pay the bank $ 31,250, and the bank agreed to cancel both of the guaranties and to release petitioner from any claims it had against him. On March 10, 1988, petitioner and the bank executed an agreement styled Settlement and Mutual Release reflecting the terms of their settlement. On July 21, 1988, the court granted the bank's motion, and it dismissed petitioner from the bank's collection suit with prejudice. Final judgment in the suit was not entered until October 18, 1989. By reason of the Settlement and Mutual Release, petitioner's liability to the bank for his share of the deficiency in the amount of $ 62,925 was extinguished in return for a payment of $ 31,250, a difference of $ 31,675. On their 1988 return, petitioners did not report any income from the discharge of indebtedness. Respondent determined that during 1988 petitioners had received discharge of indebtedness income in the amount of $ 31,675. Specifically, the notice of deficiency issued to *180 petitioners states as follows: During the taxable year 1988, the discharge of indebtedness of $ 31,675.00 that you received from NBC Bank of Houston, regarding the foreclosure, sale, and recourse note related to the Lakes of White Oak Joint Venture, was not reported on your income tax return. Accordingly, your taxable income is increased by $ 31,675.00.
In passing, we note that the Settlement and Mutual Release not only refers to petitioner's share of the First and Second Notes and to petitioner's personal guarantees of those notes, but it also refers to a third note and petitioner's personal guarantee of that note. The Settlement and Mutual Release describes the Third Note and Guaranty as follows: that certain PROMISSORY NOTE dated December 27, 1983 in the original principal amount of ONE MILLION TWENTY-THREE THOUSAND NINE HUNDRED FORTY-TWO AND NO/100 DOLLARS ($ 1,023,942.00) from SHELLY MILLER, TRUSTEE, payable to HEIGHTS STATE BANK (hereinafter referred to as "Note 1") and any renewals, extensions and modifications, and that certain GUARANTY dated December 23, 1983 executed and delivered by A.C. MARCACCIO to NBC for extending credit to SHELLY MILLER, TRUSTEE, *181 wherein liability was limited to $ 117,753.00 (hereinafter referred to as "Guaranty 1").
In the notice of deficiency, respondent treated the entire amount paid by petitioner under the Settlement and Mutual Release, $ 31,250, as attributable to the White Oak promissory notes. We also note that petitioners' 1988 return claimed a deduction on Form 4797, Sales of Business Property, in the net amount of $ 8,562 that includes the following partnership gains and losses: Colonade Joint Venture
$ 56,044 Village Chase
(4,237)
BVP/2920, Ltd.
(13,309)
Lakes of White Oak
(47,599)
Maison I-10
539 (8,562)
In the case of the loss from White Oak, there is attached to petitioners' return a statement entitled "1988 PARTNERSHIP K-1 SUPPORTING STATEMENT" that, in addition to other information, states as follows: OTHER K-1 INFO. SECTION 1231 GAIN/LOSS -- NON-INVESTPROP 47,599- The record does not make clear either the nature of the above loss claimed by petitioners or the manner in which it was computed. In any event, in the notice of deficiency, respondent disallowed the loss of $ 47,599 from White Oak, and petitioners concede the correctness of that adjustment. OPINION
*182 Petitioner entered into the Settlement and Mutual Release in 1988 and paid $ 31,250 to obtain the bank's release of his liability under the First and Second Notes, both as a general partner of White Oak and as a guarantor of the notes. Prior to the settlement, petitioner's proportionate share of White Oak's liability to the bank for the principal balance under the notes was $ 62,925. Accordingly, respondent determined that in 1988 petitioners realized $ 31,675 of income from the discharge of indebtedness pursuant to section 61(a) (12). Petitioners bear the burden of disproving respondent's determination. Rule 142(a), Tax Court Rules of Practice and Procedure. Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure. Petitioners argue that respondent erred in the subject notice of deficiency for three reasons. The first two reasons involve petitioners' claim that no discharge of indebtedness arose in 1988 from the Settlement and Mutual Release. First, petitioners argue that no discharge of indebtedness arose in 1988 because the fair market value of the Property which the bank received in the foreclosure sale in 1986 was $ 3.5 million. *183 Thus, petitioners assert that White Oak had fully paid its indebtedness to the bank, in the aggregate amount of $ 3,280,000, 2 years prior to the Settlement and Mutual Release. Second, petitioners argue that no discharge of indebtedness arose in 1988 because the Settlement and Mutual Release "embodies a compromise of a legitimate dispute between the bank and petitioners as to the fair market value of the property." (Emphasis deleted.) Finally, petitioners argue that their maximum liability to the bank was limited to $ 33,750, the amount stipulated in the Second Guaranty, and that respondent errs by computing discharge of indebtedness based upon a greater liability. Before discussing petitioners' factual contentions, it is helpful to review the tax rules which underlie this case. In general, the transfer of property in consideration of the discharge or reduction of indebtedness is equivalent to the sale of property upon which gain or loss is realized. E.g., Gehl v. Commissioner, 102 T.C. 784, 785 (1994); Danenberg v. Commissioner, 73 T.C. 370, 380-381 (1979); Estate of Delman v. Commissioner, 73 T.C. 15, 28 (1979); *184 Bialock v. Commissioner, 35 T.C. 649, 660 (1961). The amount of gain realized is the excess of the amount realized over the taxpayer's adjusted basis in the property, and the amount of loss realized is the excess of the adjusted basis over the amount realized. Sec. 1001(a). For purposes of computing gain or loss, the "amount realized" is defined by section 1001(b) as the sum of any money received plus the fair market value of the property received. However, the amount realized from the transfer of property in consideration of the discharge or reduction of indebtedness depends upon whether the debt is recourse or nonrecourse in nature. In the case of nonrecourse debt, the amount realized includes the full amount of the remaining debt. See, e.g., Commissioner v. Tufts, 461 U.S. 300 (1983); Gershkowitz v. Commissioner, 88 T.C. 984, 1016 (1987); Estate of Delman v. Commissioner, supra at 28-29. In the case of recourse debt, on the other hand, the amount realized from the transfer of property is the fair market value of the property. See, e.g., Bialock v. Commissioner, supra at 660-661. *185 Furthermore, the amount realized from the sale or other disposition of property that secures a recourse debt does not include income from the discharge of indebtedness under section 61(a) (12). See sec. 1.1001-2(a)(2), Income Tax Regs. This will arise when the discharged amount of the recourse debt exceeds the fair market value of the property. Generally, a taxpayer must recognize income from the discharge of indebtedness. Sec. 61(a) (12); United States v. Kirby Lumber Co., 284 U.S. 1 (1931). The statute provides exceptions to the recognition of income from the discharge of indebtedness in cases where the discharge occurs in a bankruptcy under title 11 of the United States Code, in cases where the discharge occurs when the taxpayer is insolvent, or in cases where the indebtedness is "qualified farm indebtedness." See sec. 108(a). For cases dealing with the "insolvency exception", under which a debtor is not required to recognize income under section 61(a) (12) if the debtor is insolvent following the discharge of indebtedness, see Babin v. Commissioner, 23 F.3d 1032, 1035 (6th Cir. 1994), affg. T.C. Memo. 1992-673; *186 Dallas Transfer & Terminal Warehouse Co. v. Commissioner, 70 F.2d 95 (5th Cir. 1934), revg. 27 B.T.A. 651 (1933). If the debtor is a partnership, then the gain or loss realized from the transfer of property in consideration of the reduction or discharge of a debt is passed through to each of the partners under section 702, and is reflected in each partner's adjusted basis in the partnership pursuant to section 705(a). See secs. 702(a) (1), (2), and (3), 705(a). Furthermore, if discharge of indebtedness arises from the transaction, then the amount of the discharge of indebtedness is also passed through to each of the partners under section 702 in accordance with his or her interest in the partnership, and is reflected as an increase in the adjusted basis of each partner in the partnership pursuant to section 705(a). See Babin v. Commissioner, supra; Gershkowitz v. Commissioner, supra at 1005. But cf. Estate of Newman v. Commissioner, 934 F.2d 426 (2d Cir. 1991), revg. and remanding T.C. Memo. 1990-230; *187 Stackhouse v. United States, 441 F.2d 465 (5th Cir. 1971). In addition, the amount of income from the discharge of indebtedness reflects a decrease in the liabilities of the partnership and, thus, is treated under section 752(b) as a distribution of money to the partners by the partnership. Sec. 752(b); see Babin v. Commissioner, supra; Gershkowitz v. Commissionersupra; Stackhouse v. United States, supra.As in the case of any distribution of money by a partnership, each partner would recognize gain to the extent that the amount distributed; i.e., the amount of the discharge of indebtedness, exceeds the partner's basis in the partnership. Sec. 731(a) (1); Gershkowitz v. Commissioner, supra at 1005-1006. The gain so recognized would be characterized as gain from the sale or exchange of the distributee partner's interest in the partnership and would be taken into income under section 61(a) (3) as a gain from dealings in property. Furthermore, the adjusted basis of the interest of each distributee partner in *188 the partnership would be reduced by the amount of the distribution. Sec. 733. It is important to note that, in the case of a partnership, the insolvency and bankruptcy exceptions to recognition of discharge of indebtedness income provided by section 108(a) are applied at the partner level. See sec. 108(d) (6). A partner who is insolvent before and after the cancelation of a partnership debt, therefore, would not recognize income from the discharge of indebtedness. Sec. 108(a) (1) (B). Neither would that partner be permitted to increase the adjusted basis of his or her interest in the partnership under section 705(a)(1)(A). Babin v. Commissioner, supra.
In this case, the bank foreclosed its security interest in the Property in 1986 by causing the Property to be sold at a foreclosure sale. The bank then purchased the Property at the sale for $ 2,441,000. At the time of the foreclosure sale, White Oak's basis in the Property was $ 2,912,499. Accordingly, White Oak realized and recognized a long-term capital loss on the foreclosure sale in 1986 of $ 471,999 ($ 2,441,000 less $ 2,912,999). Sec. 1001(a). White Oak also reported petitioner's *189 7.5-percent share of the loss, $ 35,362, on petitioner's Schedule K-1. See sec. 752(b). After the foreclosure sale, White Oak owed the bank the unpaid principal balance of the First and Second Notes in the aggregate amount of $ 839,000. The bank sued White Oak and 10 of its 12 partners, including petitioner, for collection of that deficiency. In its suit, the bank sought to recover $ 369,750 from petitioner, the total of the First and Second Guaranties. However, petitioner's share of the deficiency was $ 62,925, and petitioner subsequently settled the bank's suit for $ 31,250. The issue is whether this settlement resulted in cancellation of indebtedness income to petitioners in the amount of $ 31,675. At the outset, we note that the adjustment at issue in this case involves respondent's determination that petitioners' taxable income should be increased due to cancellation of a partnership debt. Neither party suggests that respondent's adjustment involves a "partnership item" as defined by section 6231(a) (3), the tax treatment of which is required to be determined in a unified partnership proceeding rather than in a separate proceeding with an individual partner. See secs. *190 6221-6231; cf. Dubin v. Commissioner, 99 T.C. 325 (1992). In this regard, we note that respondent's post-trial brief states that White Oak "terminated in 1986 due to the foreclosure of its only asset." Petitioners' first argument is that they realized no income from discharge of indebtedness "because the property foreclosed upon in satisfaction of the debt had a fair market value in excess of the debt outstanding." (Emphasis deleted.) Petitioners assert that at the time of the foreclosure sale, the fair market value of the Property was at least $ 3.5 million, not $ 2,441,000, the amount paid by the bank. Thus, according to petitioners, the value of the Property obtained by the bank in the foreclosure sale exceeded the aggregate principal amount of both the First and Second Notes, $ 3,280,000, and paid those notes in full. By implication, petitioners' position is that White Oak realized a gain from the foreclosure sale in 1986, rather than a loss. Petitioners acknowledge that, absent clear and convincing proof to the contrary, the sale price of property at a foreclosure sale is presumed to be its fair market value. See Community Bank v. Commissioner, 79 T.C. 789, 792 (1982), *191 affd. 819 F.2d 940 (9th Cir. 1987); sec. 1.166-6(b) (2), Income Tax Regs. However, petitioners claim that the presumption does not apply in this case because the foreclosure sale was not lawful. See Community Bank v. Commissioner, supra at 792. According to petitioners, this is true because the bank did not give notice of the foreclosure to petitioners as required by Texas law. See Tex. Prop. Code Ann. sec. 51.002 (West 1975). Furthermore, petitioners assert that "the record of the trial in this case contains clear and convincing evidence that the fair market value of the property exceeded the foreclosure price." Petitioners did not prove either factual contention, and we reject both of them. Petitioner's testimony that he did not receive notice of the foreclosure sale is contradicted by the Stipulation of Facts, filed by the parties, which states as follows: The bank sent the joint venture a letter on October 11, 1986 informing the joint venture of its intent to foreclose on land held by the joint venture. A copy of the letter to the joint venture dated October 11, 1986, is attached hereto and marked Joint *192 Exhibit J-E.
The letter referred to above was addressed to White Oak, and sets forth the bank's intention to foreclose the bank's liens securing the First Note by causing the trustee to sell the Property. The letter reflects the fact that copies were sent to petitioner by certified mail, Receipt for Certified Mail Nos. P657 864 899 and P657 864 869. Additionally, Mr. Barry Racusin, the attorney who represented the bank in its collection suit against petitioner, testified as follows: Q Did you ever send out a notice, or anyone in your firm ever send out a notice, This [sic] property is going to be foreclosed, or that a note was in default, or that you were going to accelerate the note to Mr. Marcaccio? A Our firm did not handle that aspect -- Q Okay. A -- and so we would not have sent any such notices. Q Did you ever see any of those notices? Did you ever see any notice like that to Mr. Marcaccio? A I saw no notices, but, again, when obtaining copies of the substitute trustees [sic] deed, the company affidavit indicated that the notice had been given and was sworn under oath.
Thus, even though Mr. Racusin stated that he never saw a copy of the actual *193 notice sent to petitioner, he stated that he relied upon the bank's affidavit, sworn under oath, that the notice had been sent. Mr. Racusin's testimony is consistent with both the October 11, 1986, letter and the Texas statute, which states that an affidavit such as the one referred to by Mr. Racusin is prima facie evidence that notice has been given. See Tex. Prop. Code Ann. sec. 51.002(e). Additional evidence that the bank notified all of the debtors on the First Note, including petitioner, of the foreclosure sale is found in the Substitute Trustee's Deed, which states as follows: on October 13, 1986, the holder of the indebtedness secured by said Deed of Trust served written notice of the proposed sale by certified mail on all debtors obligated to pay such debt according to the records of such holder by depositing the notice, enclosed in a postpaid wrapper, properly addressed to such debtors at the most recent address as shown by the records of the holder of the debt, in a Post Office or official depository under the care and custody of the United States Postal Service.
In light of the above, we reject petitioner's contention that he was not given notice of the foreclosure *194 sale as required by Texas law. Accordingly, petitioners have shown no basis for us to conclude that the foreclosure sale was unlawful under Texas law and no basis to overcome the presumption that the sale price at the foreclosure sale, $ 2,441,000, was the fair market value of the Property at that time. See Community Bank v. Commissioner, supra 792; sec. 1.166-6(b)(2), Income Tax Regs.
Moreover, petitioners introduced no credible evidence that the fair market value of the Property at the time of the foreclosure sale exceeded the foreclosure price or was $ 3.5 million. Their contention that "the fair market value of the property exceeded the foreclosure price" is based entirely upon petitioner's testimony and the testimony of the bank's attorney. During his direct examination, petitioner stated as follows: Q What was the fair market value of the land in 1986? A I would judge $ 3-1/2 million.
However, on cross-examination, petitioner was asked to explain how he determined that the fair market value of the Property was $ 3.5 million, and he testified as follows: Q How did you determine the fair market value of 3,500,000? A *195 The conditions at the time in the Houston area were such that we were on -- we were in the heyday of increasing value. And because the money was easily loaned through the bank, we assumed that we had a value of 3.5 million. Q Did you personally determine the fair market value? A Did I personally do it? I don't think I have the experience to do that.
Thus, petitioner explained that he "assumed" that the value of the property was $ 3.5 million based upon the fact that the bank "easily loaned" the money to White Oak, and petitioner specifically acknowledged that he did not have the experience necessary to value the Property. Similarly, the testimony of the bank's attorney, Mr. Racusin, does not prove that the fair market value of the Property was $ 3.5 million at the time of the foreclosure suit. The portion of Mr. Racusin's testimony on which petitioners rely is as follows: Q But do you have any -- does $ 3.5 million stick in your mind other than a discussion that we had the other day? A I have just a fleeting recollection of seeing something in the file with the $ 3-1/2 million number on it. Q Okay. And could that be the letter from the bank's -- A It *196 could very well be. Q -- vice-president, Leon -- A Could be Mr. Rigimonte's one-pager, as we call it.
The above testimony of Mr. Racusin's "fleeting recollection of seeing something in the file with the $ 3 1/2 million number on it" is hardly sufficient to establish the Property's fair market value at the time of the foreclosure sale. Moreover, the record of this case does not contain the document described as "Mr. Rigimonte's one-pager". Petitioners' second argument is that: the difference between the alleged amount of the deficiency and the amount of the settlement is not cancellation of indebtedness income to the petitioners because the settlement embodies a compromise of a legitimate dispute between the bank and petitioners as to the fair market value of the property." [Emphasis deleted.]
Petitioners cite Exchange Sec. Bank v. United States, 345 F. Supp. 486 (N.D. Ala. 1972), revd. on other grounds 492 F.2d 1096 (5th Cir. 1974), for the proposition that the compromise of a disputed debt does not result in cancellation of indebtedness income. See also Zarin v. Commissioner, 92 T.C. 1084, 1095 (1989), *197 revd. on other grounds 916 F.2d 110 (3d Cir. 1990); N. Sobel, Inc. v. Commissioner, 40 B.T.A. 1263 (1939). Contrary to petitioners' contention that "there was a legitimate dispute as to whether the fair market value of the Property at the time of the foreclosure exceeded the amount of the outstanding debt", there is no evidence that petitioners ever raised such contention prior to this proceeding. For example, as discussed above, White Oak reported a loss of $ 471,499 from the disposition of the Property. In computing that loss, White Oak treated the purchase price at the foreclosure sale, $ 2,441,000, as the fair market value of the Property. Petitioners reported Dr. Marcaccio's share of that loss, $ 35,362, on their 1986 income tax return, which was filed on or about August 15, 1987, and they again reported it on an amended 1986 return which was filed in December 1987. Furthermore, the petition filed by the bank in its collection suit against White Oak and its partners recites the $ 2,441,000 sale price of the Property in establishing the basis for the complaint. Petitioner never disputed that allegation in the form *198 of a denial or counterclaim against the bank. In effect, the premise of petitioners' argument is that White Oak and its 12 partners permitted the bank to purchase property worth $ 3,500,000 for $ 2,441,000, $ 1,059,000 less than the value of the Property, and that they took no action at the time of the foreclosure sale to realize that difference. We are not willing to accept the premise of petitioners' argument. Petitioners' last argument is that: the amount of cancellation of indebtedness income recognized by petitioners should be calculated by assuming that petitioners were only ultimately and primarily liable for that portion of the total debt petitioners guaranteed in the final guaranty. [Emphasis deleted.]
In effect, petitioners claim that their liability for the First and Second Notes was limited to $ 33,750, the maximum liability established by the Second Guaranty. Thus, according to petitioners, if cancellation of indebtedness income arose from the Settlement and Mutual Release, it must be calculated by taking into account the fact that petitioner's maximum liability to the bank was $ 33,750, rather than the $ 62,925. Petitioners' argument centers on the "future *199 advance clause" found in the First Guaranty. According to this argument, petitioner was already liable under the future advance clause of the First Guaranty for "all indebtedness, obligations and liabilities of any kind of the Borrower to the Bank * * * now outstanding or owing or which may hereafter be executed or incurred". Therefore, the Second Guaranty would have been unnecessary unless the bank intended "to limit petitioner's obligation to the Bank." Petitioners' argument raises the question whether the bank and petitioner intended the Second Guaranty to replace the First Guaranty. See Shepherd v. Eric Schuster Corp., 424 S.W.2d 693, 697 (Tex. Civ. App. 1968); Warner v. First Natl. Bank, 369 S.W.2d 651, 653 (Tex. Civ. App. 1963). Certainly, the execution of the Second Guaranty, by itself, does not prove that they intended to replace the First Guaranty. FDIC v. Attayi, 745 S.W.2d 939, 947 (Tex. App. 1988); Shepherd v. Eric Schuster Corp., supra at 697. Petitioner's entire testimony on this point is the following: Q Did you sign a guarantee *200 in 1986? A I would have to believe I signed the guarantee. Q Was that guarantee limiting your liability to $ 33,750? A Yes. Q Now, without that guarantee, Mr. Marcaccio, would you have been liable for 100 percent of the joint venture debts? A Without that guarantee I would have. * * * Q Was the purpose of signing that guarantee in 1986 to limit your liability? A To limit my liability. Yes. Q Was it to limit your liability to $ 33,750? A That is right.
We agree, as petitioner suggests above, that the purpose of the Second Guaranty was to limit his liability under the Second Note to $ 33,750. We do not agree, however, that the purpose of the Second Guaranty was to limit petitioner's liability to the bank under both the First and Second Notes to $ 33,750, or that the Second Guaranty was intended to replace or supplant the First Guaranty. Petitioner does not testify to that effect in the above passage, or at any other time during his testimony. Moreover, petitioners have presented no credible evidence that the bank intended the Second Guaranty to replace the First Guaranty. In fact, to the contrary, it is evident that the bank did not intend the *201 Second Guaranty to replace the First Guaranty. First, there is nothing to explain why the bank would have agreed to reduce petitioner's liability under the First Note from $ 336,000 to $ 33,750 and, at the same time, to lend White Oak an additional $ 300,000. Second, the bank's collection suit sought to collect the full amount of both guaranties, $ 369,750, from petitioner. The fact that the bank settled its claim against petitioner for $ 31,250 was, according to the bank's attorney, Mr. Racusin, due to the bank's desire to settle the case quickly and not, as petitioners argue, because the bank believed that petitioner's liability was limited to $ 33,750. For the foregoing reasons, Decision will be entered for respondent.