EXCHANGE SECURITY BANK et al.,
Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Ellen Gregg INGALLS et al.,
Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. A. Nos. 66-684-S, 68-389-S.

United States District Court,
N. D. Alabama, S. D.

June 7, 1972.

Robert McDavid Smith, Allen D. Rushton-Lange, Simpson, Robinson & Somerville, Birmingham, Ala., for plaintiffs.

Jack D. Warren, Tax Div. Dept. of Justice, Washington, D. C., Henry I. Frohsin, Birmingham, Ala., for defendant.

## MEMORANDUM OF OPINION

POINTER, District Judge.

These actions, consolidated for trial, have been brought under 28 U.S.C. § 1346(a) (1) for the refund of income taxes collected on the 1960 incomes of Ellen Gregg Ingalls (CA 66–684) and of the Estate of Robert I. Ingalls Sr., deceased (CA 68–389).[1] According to

1. Exchange Security Bank, Sam M. Boykin Jr., and James E. Simpson, as Executors, were substituted as plaintiffs in CA 66–684 following Mrs. Ingalls' death in 1969. Plaintiffs in CA 68–389 are the Exchange Security Bank and James A. Simpson, the surviving testamentary trustees under

the will of Robert I. Ingalls Sr. At the time of instituting CA 68–389 Mrs. Ingalls was a third trustee and plaintiff. In this memorandum the terms "plaintiffs" and "taxpayers" may for convenience be used interchangeably notwithstanding the technical differences.

the assessments Mrs. Ingalls and her late husband's estate realized income in 1960 to the extent of $44,942.14 and $188,532.83, respectively, from the cancellation in that year by Ingalls Iron Works Company of debts owed by them to the company. The cancellation is said to have arisen as an incident of an agreement which settled part of a bitter intrafamily dispute which had been going on for more than a decade, even the settlement of which spawned its own court battles.[2] With good reason no effort is made to claim a gratuitous forgiveness under Helvering v. American Dental Co., 318 U.S. 322, 63 S.Ct. 577, 87 L.Ed. 785 (1943) or insolvency on the part of the debtors per Mertens, Law of Federal Income Taxation, § 11.22.

The family conflict erupted in 1948 when Mr. Ingalls Sr. opposed the marital plans of his son, Robert I. Ingalls Jr. Mr. Ingalls Sr., the founder and chief executive officer of Ingalls Iron Works Company, controlled its affairs; although, due to outright gifts and the establishment of family trusts, he no longer had a majority of the stock in his own name. Mr. Ingalls Jr. was, as President and Vice Chairman, second in command of the company, as well as its largest individual stockholder. When the son went forward with the marriage, he soon found himself neither an officer nor a director of the company. Mr. Ingalls Sr. died in 1951, and by 1953 the son had managed to become the chief corporate executive, although his position was hardly secure in view of the some thirty separate lawsuits which were filed in the state and federal courts by one or another of the interested parties and companies. The focal point was a case in the state court in which Mrs. Ingalls was contesting, and her son was supporting, the company's belated exercise of an option to redeem the 2,287 shares of stock owned by Mr. Ingalls Sr. at the time of his death, shares which otherwise would have gone into testamentary trusts over which Mrs. Ingalls had significant powers.

While the son was in control, the company instituted in this court two "collection" suits: one seeking to recover from the Estate of Mr. Ingalls Sr. a principal indebtedness of $188,532.83 (of which $120,000 was evidenced by his promissory note and the balance reflected in an open account on the company's books); and the other seeking to collect from Mrs. Ingalls $52,165.93[3] allegedly due from her by account stated. As is not unusual with closely held family corporations, the company over the years had paid various personal bills and tax liabilities of Mr. and Mrs. Ingalls Sr., reflecting the same as accounts receivable, with credits being made against the accounts principally from company dividends and from their personal "outside" income being collected by the company as their agent.

The Estate formally denied any indebtedness, and counterclaimed for some $541,000 in unpaid dividends on the 2,287 shares of stock which were the subject of the redemption dispute. Mrs. Ingalls denied any indebtedness on her own part, specifically denying any "account stated," and counterclaimed for $141,051.17. According to her counterclaim, the company had erroneously charged her account with $193,217.10 in taxes paid by it to state and federal agencies. These taxes, she said, should

2. Litigation over the efficacy of the settlement agreement is recorded in 177 F. Supp. 151 (N.D.Ala.1959), aff'd 280 F. 2d 423 (5th Cir. 1960). Summaries of the dispute may be found in the opinions at 266 Ala. 656, 98 So.2d 30 (1957) and at 158 F.Supp. 627 (N.D.Ala.1958). Of particular interest in the instant case are the opinions on the original trial and appeal in action CA 8450, brought by the company against Mrs. Ingalls, 152 F. Supp. 523 (N.D.Ala.1957), rev'd 258 F.2d 750 (5th Cir. 1958).

3. The court eliminated $188.79 from the claim, and the company acknowledged a creditable offset of $3,517.50 for the June 1956 dividend on her stock, reducing the claim to $48,459.64. The September 1956 dividend was subsequently applied to the account, reducing finally the claim to $44,942.14.

have been charged to Mr. Ingalls' account by virtue of an agreement made years earlier between the two of them whereby, in consideration for using her income to pay household expenses, he agreed to pay her tax liabilities. It is apparent that the formal denials of indebtedness were designed in large part to put the company to potentially insurmountable evidentiary problems.[4]

The case against Mrs. Ingalls was tried in 1957 (on the theory of an account stated), resulting in a verdict and judgment favorable to the company for the amount claimed by it plus interest. 152 F.Supp. 523 (N.D.Ala.1957). The Fifth Circuit reversed, concluding that Mrs. Ingalls' response to an auditor's inquiry was insufficient to convert what had been an open account into an account stated. 258 F.2d 750 (5th Cir. 1958). After the remand the complaint was amended to add counts charging an open account, and Mrs. Ingalls parried by adding the defense of the Alabama three-year statute of limitations.

The retrial was scheduled for the March 1959 docket. Among the lawsuits then still pending were the company's case in this court against the Estate of Mr. Ingalls Sr. (which cause had apparently lain dormant) and the case in the state court challenging the stock redemption (which was back in the trial court after an interlocutory appeal to the Alabama Supreme Court).

While waiting for the case against Mrs. Ingalls to be reached on the trial docket the parties commenced negotiations looking to a broader resolution of their multi-faceted dispute. An accord was reached, the terms of which were entered of record by this court on March 10, 1959. The terms of the settlement, briefly summarized, were as follows:

The stock redemption of Mr. Ingalls' 2,287 shares was set aside, such shares being recognized as part of his Estate and in turn divided between the two trusts established under his will. One of the trusts was a "marital" trust for the benefit of Mrs. Ingalls during her lifetime, coupled with a general testamentary power of appointment, which she agreed to exercise in favor of her two granddaughters.[5] It was agreed that the shares placed in the other trust (for the benefit of a family foundation) were to be subject, at Mrs. Ingalls' death, to an option to purchase for a stipulated price, the granddaughters having a priority over the company regarding such option. The Estate's claim for back dividends was waived except to the extent of $175,000, which was to be paid to its attorneys as fees. The company's suits on the accounts were to be dismissed with prejudice, as were the counterclaims therein. Mrs. Ingalls was to be returned to the Board of Directors and to be elected to a corporate office at a compensation of at least $10,000 per year.

Shortly thereafter the company sought to renege on the settlement, contending that those representing it lacked authority to make such an agreement and that certain of the obligations undertaken by the other parties to the settlement were beyond their legal power. The company's contentions were rejected by this court in August 1959 (see 177 F. Supp. 151) and by the Fifth Circuit in August 1960 (see 280 F.2d 423). In September 1960 the company's Board of Directors adopted a resolution accepting, and directing immediate compliance with, the settlement, and in the same

---

4. The company's problem (except as to the amount evidenced by Mr. Ingalls' note) was that it had no voucher records for individual transactions prior to 1950 and before 1934 did not even have ledger records. In its case against the Estate it further was faced with Alabama's Dead Man's Statute.

5. They had ultimately sided with their grandmother, rather than their father, in the dispute.

month final docket entries disposing of the company's "collection" suits were entered in this court.[6] In May 1961 entries were made on the company's books charging off against retained earnings, as of December 31, 1960, the two accounts.

■ The government has taken the position in its assessments and in these actions that Mrs. Ingalls and the Estate of Mr. Ingalls realized income [7] by the cancellation in 1960 of debts owed by them to the company in the amounts of $44,942.14 and $188,532.83, respectively. I.R.C. § 61(a) (12). Plaintiffs' suits for refunds are premised upon contentions which deny the debts, deny their cancellation, assert the lack of any enrichment thereby, and assert that in any event a year other than 1960 would be the correct period for inclusion. The burden is on the plaintiffs to prove one of their contentions; they are not excused from that responsibility by showing the difficulty or impossibility of that task. Burnet v. Houston, 283 U.S. 223, 51 S.Ct. 413, 75 L.Ed. 991 (1931); Allen v. Comm'r of Internal Revenue, 117 F.2d 364 (1st Cir. 1941).

This case presents a question not clearly answered by reported tax cases: Under what circumstances does D realize cancellation of indebtedness income when he settles a disputed collection suit brought against him by P for less than the amount P claims is owing? It is sometimes said that the compromise of a disputed debt does not give rise to income to the debtor. See, e. g., Mertens, Law of Federal Income Taxation, § 11.19. And certainly the dismissal by a plaintiff without any payment of a spurious collection suit for a debt which never existed or was never a legal obligation of the defendant should not create income. See United States v. Hall, 307 F.2d 238 (10th Cir. 1962); Autenreith v. Comm'r of Internal Revenue, 115 F.2d 856 (3rd Cir. 1950). Nor should the result be different if, to save the time and expense of defending the suit or to avoid the hazards inherent in almost all litigation, D is willing to make some payment to P. That there is no income in such situations may be understood either on the basis that no "debt" is being cancelled or that the nominal debtor in reality is not enriched thereby. Cf. United States v. Kirby Lumber Co.,

6. Post-judgment sparring over later dividends continued into December 1960. See United States v. Ingalls, 399 F.2d 143 (5th Cir. 1968), for later developments in the overall settlement of the dispute.

7. Preliminarily the government had proposed to tax the income as dividends (thereby entitling the taxpayers to a dividends received credit, reducing somewhat their potential liability). "The cancellation of indebtedness of a shareholder by a corporation shall be treated as a distribution of property [for purposes of I.R.C. § 301, the section dealing with taxation of dividends]." Regs. § 1.301–1 (m). The final assessment, on which the tax here in controversy was paid, did not however allow the dividends received credit, apparently as a response to an alternate argument advanced by taxpayers to the effect that the debts could be considered as satisfied by the transfer from taxpayers of other property. Since this decision of the court upholds taxation on the theory of a cancellation of indebtedness (of a stockholder's debt), it is clear

that under the regulation the income should receive treatment as a dividend, and thus the credit allowed. At first blush the utilization of I.R.C. § 301 might seem to give additional support for taxpayers' arguments directed to the minimal value of the accounts in 1960 since under § 301(b) (1) (A) the amount of a dividend to a non-corporate shareholder paid other than in cash is the fair market value of the property distributed. The conclusion seems to have been adopted however that the discharge of a stockholder's indebtedness should be considered as equivalent to a cash distribution and hence measured by the face amount of the debt rather than its value. See Gibbs v. Tomlinson, 362 F.2d 394 (5th Cir. 1966). If taxpayers were successful in establishing that the § 301 income were limited to the value of the debt, they then would find the difference between that value and the face amount being taxed as ordinary income (without the dividend credit) under United States v. Kirby Lumber Co., 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131 (1931).

284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131 (1931).

On the other hand *D* may actually owe the debt; and yet *P,* confronted with a denial of liability, may be willing to settle, saving the time and expense of litigation, by accepting a much smaller payment than that actually owing. Where there are serious problems of proof or of collectibility, or when *P* is confronted with unusual policy considerations, he may even be willing to dismiss the suit without any payment. In such situations it seems clear that *D* would thereby realize cancellation of indebtedness income subject to the "insolvency" and "gift" exceptions.

■ The conclusion which must be reached is that the settlement of a disputed debt may or may not result in cancellation-type income. The institution of a collection suit by a purported creditor does not establish that a debt exists or has existed, but essentially is only evidence that the plaintiff so contends; likewise, a defendant's denial of liability does not establish that a debt does not exist or is no longer enforceable, but essentially is only evidence that the purported debtor so contends. The terms of the agreement settling the litigation are of probative value (though not conclusive) in determining the relative merits of the two parties' positions—for example, the payment of no or only nominal consideration by the purported debtor tends to support the conclusion that at least one of its defenses is well taken. These are matters of evidence; the trial court in a tax case involving alleged cancellation-type income must, it appears, determine the underlying, critical facts, *e. g.,* the actual amount (if any) of the debt. See Gibbs v. Tomlinson, 362 F.2d 394 (5th Cir. 1966).

■ The defenses tendered by Mrs. Ingalls and her husband's Estate in the collection suits had essentially two aspects. First, there were denials of the existence of the debts; *i. e.,* whether the company had paid the items debited to the two accounts; whether such items were for the benefit of Mr. or Mrs. Ingalls or otherwise authorized by them; whether there was an express or implied undertaking by either of them [8] to repay such items (rather than, for example, have them treated as dividends or additional compensation at the time of the company's payment); and whether there were repayments of such items via applied dividends, etc. Secondly, the denials challenged the judicial enforcement of such debts; *e. g.,* lack of underlying documentation; Dead Man's statute; and ultimately (by special pleading) the statute of limitations.

For the reasons previously indicated this court is in accord with the proposition that, if the purported debts were never legal obligations of the Ingalls or had previously been paid in full (the "first" aspect of their denials), then the formal recognition of that fact by dismissals of the lawsuits would not have resulted in cancellation-type income. But—and this is the critical point— whereas in the collection suits the company had the burden of presenting evidence to establish those debts, in this case for tax refund the burden is on the taxpayers, to disprove those debts. The plaintiffs here have essentially done nothing more than present the pleadings on file and the settlement agreement, an agreement which in the light of all circumstances is due to be treated (insofar as the cancellation of the two accounts is concerned) as a recognition of the "second" aspect of their denials of liability rather than any admission that

---

8. A major contention by Mrs. Ingalls was that the items charged to her account were really the obligation of her husband. Had this been proved to the satisfaction of this court, it would have meant that the income realized on cancellation of her account was that of her husband's estate rather than her own. Such a deci-

sion presumably would constitute a "determination" leading to a belated assessment of an additional deficiency against his Estate under I.R.C. §§ 1311, 1312(3) (A), 1313(c) (4). The question could also arise as to the tax consequences where a person's tax liabilities are paid by another.

the debts never existed. The plaintiffs have failed to demonstrate by credible evidence that the debts were not (at least at some point in time) legal obligations of the Ingalls in the amounts claimed by the company. The presumptive validity attending the government's assessment, one element of which is that the taxpayers did owe these debts, remains undisturbed and must be given effect by the court.

Moreover, the evidence before this court tends, if anything, to support the conclusion that Mr. and Mrs. Ingalls owed these accounts to the company. The accounts were shown on the books of the company and not written off while Mr. and Mrs. Ingalls were in control of its affairs. His executors did not deny that Mr. Ingalls had executed shortly before his death the promissory note representing the larger part of the company's claim against his estate, and they listed the full amount claimed by the company on the estate tax return as a deductible debt of the decedent.[9] Mrs. Ingalls did not denying having signed or initialed an auditor's request that she confirm the balance of her account as of the close of 1951 (at a figure in excess of $52,000). The evidence presented at a trial in 1957 was sufficient to convince a jury, with the approval of a district judge, that Mrs. Ingalls was indebted to the company for some $48,000 (plus interest), albeit on the incorrect theory of an account stated (rather than a potentially barred open account).

The taxpayers argue persuasively that there was little, if any, consideration flowing from the Ingalls for the dismissal of the company's two collection suits.[10] Hence, the argument goes, the debts were essentially without value in 1960 and therefore there was nothing in 1960 to cancel. Only as a very weak and unconvincing alternative argument do the taxpayers attempt to escape taxation on the theory of a transfer of property in exchange for (*i. e.* in payment of) the alleged debts, and even so the contention assumes a greatly depreciated value of the accounts below their face amounts.[11]

9. It is no answer to say that the government disallowed the deduction. I.R.C. § 2053(a) (3) limits the deduction to such claims "as are allowable by the laws of" Alabama, making the estate tax deduction dependent not only upon the existence of the debt, but also upon its legal provability and enforcement.

10. Mrs. Ingalls gave up directly in the settlement (in which her rights, quite valuable, to the stock in question were accepted) two things: (1) an agreement to exercise her general testamentary power of appointment over such stock (*i. e.*, the half in the marital trust) in favor of her two granddaughters (who were, after all, the "natural" objects of her bounty at that point), an agreement which provided only remote benefit to the company itself; and· (2) a dismissal of her "tax" counterclaim against the company. For aught appearing, this counterclaim, which was premised upon an oral agreement years earlier to which the company was not even a party and which had been ignored over twenty years, had no real substance and was but a tactic employed by her attorneys to emphasize the hazards of litigation. Moreover, the recognition of this "tax" counterclaim would have effectively meant· that someone else was paying tax liabilities, which can give rise to a realization of income in its own stead. The Estate (and *indirectly*, due to her life estate therein, Mrs. Ingalls) gave in the settlement (in which its rights to the valuable stock were recognized, together with some $175,-000 in back dividends) likewise two forms of consideration: (1) an agreement to have half the stock subject to redemption by the company at Mrs. Ingalls' death; and (2) a waiver of its claim for an additional $366,000 in back dividends. It is questionable how much "detriment" the Estate suffered in granting the redemption agreement since (as contrasted with the redemption agreement outstanding at Mr. Ingalls' death) it covered only half the stock, at more than double the price per share, and was exercisable only if declined by the granddaughters. Of course the waiver of the additional $366,-000 in back dividends was of substantial value; however, if such release had been the *quid pro quo* for the cancellation of the accounts, it would certainly have constituted dividend income just as did the $175,000 in fact paid.

11. Actually the taxpayers emphasize that the dismissal of the lawsuits was but part of a larger settlement package and

The court concludes, as urged by the plaintiffs, that these debts had by 1959 become of limited value in the hands of the company—not because they were not bona fide legal obligations earlier, but rather because time had created almost insurmountable barriers to their collection against unwilling debtors, e. g., due to the loss of underlying evidence, the Dead Man's Statute, and the Statute of Limitations. The plaintiffs therefore contend that the debts could not have been discharged in 1960 or, in what is essentially the same argument, that they were not enriched in 1960. Their position, if sustained, would however be but a temporary reprieve; for the necessary consequence would be a holding that the discharge or enrichment had taken place, albeit in some earlier year or years.[12]

■ The question of when income should be treated as realized, significant largely due to the graduated tax brackets and the concept of annual accounting, is a thorny one, with the courts indicating a concern both for economic realities and for administrative difficulties. With rare exceptions the search is for an identifiable event, thereby leading taxpayers and taxing authorities to the same year for any dispute they may have. Realization of income from cancellation of indebtedness should be in the year in which it becomes clear and virtually certain—something more than probable, yet not necessarily awaiting absolute certainty—that the debt will never have to be repaid; and in finding such a year the authorities should look to the actions of the two parties to see if there is a point at which they themselves have accepted that conclusion. It should be noted that the incidence of taxation is not the debt becoming worthless (compare I.R.C. § 166), but its discharge (often referred to as "cancellation"), suggesting that taxation of the debtor should await either his judicial release or some positive giving up by the creditor.

■ In the present cases there is nothing to indicate that the company had given up on its claims against the Ingalls prior to 1959; despite the setback in the Court of Appeals in 1958 on the "account stated" theory, the company announced ready for trial in March 1959 against Mrs. Ingalls notwithstanding her plea of the statute of limitations. The running of the statute of limitations does not extinguish the debt; it only affects the remedy—it may not even be raised by the debtor; and, if raised, there may be questions about whether it has been tolled or waived or, (as here), which statute is applicable and whether the claim can be proved in a different form (e. g., account stated) with a longer period. The court concludes that Mrs. Ingalls' discharge from the indebtedness did not occur when, as to one form of the claim, the limitations period may have

this certainly must be conceded. They go on, moreover, to say that it is improper to match up the respective considerations or even investigate the effects of the dismissals—that this would be ignoring the remaining (and more significant) parts of the settlement. The court agrees that the total settlement must be analyzed, but it categorically rejects any insinuation that the constituent elements should in the process be held as non-existent. This is not, however, a case where the debts cancelled can be traced to the earlier acquisition of presently depreciated property. See Hirsch v. Comm'r of Internal Revenue, 115 F.2d 656 (7th Cir. 1940). Nor can the cancellation realistically be viewed as the consideration paid for the acquisition of any specific properties, or conversely, viewed as paid by the transfer of any specific properties.

12. A determination to such effect would no doubt trigger otherwise barred assessments by the Commissioner for the earlier years under I.R.C. § 1311· et seq. Of course there might be some advantage to the taxpayers if their brackets were lower in the earlier years. It should be noted that, in view of the court's findings that the debts were valid obligations (arising when corporate assets were used for their personal benefit), there has been "enrichment" (upon the freeing of assets from repayment liability) at some point in time, if not in 1960 then in an earlier year and not a mere diminution of a loss. Cf. Bowers v. Kerbaugh-Empire Co., 271 U.S. 170, 46 S.Ct. 449, 70 L.Ed. 886 (1926).

run or when she first asserted the statute as a defense thereto. Cohen v. Comm'r of Internal Revenue, 77 F.2d 184 (6th Cir. 1935), cert. denied, Rosenbaum v. Commissioner of Internal Revenue, 296 U.S. 610, 56 S.Ct. 129, 80 L.Ed. 433 (1935); Mertens, Law of Federal Income Taxation, § 11.19. For like reason—and not unmindful of the additional uncertainties such a rule would generate—the court rejects the contention that cancellation of the accounts should be deemed to occur when the creditor's evidentiary problems reached the point of rendering the accounts unlikely of judicial collection, that is, absent his assent thereto. The court should be very reluctant, moreover, to adopt a rule that would result in a taxpayer being confronted by the government's claim of cancellation of indebtedness income while he was still defending in court against the creditor's action for payment.

In March 1959 the company agreed *to* dismiss the suits (*i. e.*, to discharge the debts); but there were actions to be taken by the other parties to the settlement and while such steps were being completed the company attemped to repudiate the agreement. An agreement to cancel in the future is hardly an agreement of cancellation (particularly where the party denies the binding nature of such agreement), Walker v. Comm'r of Internal Revenue, 88 F.2d 170 (5th Cir. 1937), at least until all that remains is a mere formality by a fully willing creditor, United States v. Ingalls, 399 F.2d 143 (5th Cir. 1968).

It was in September 1960—following an adverse decision by the Fifth Circuit —that the company finally capitulated on these accounts. The suits were dismissed with prejudice in the courts, and the directors of the company adopted a resolution acceding to the terms of the settlement and directing forthwith compliance by their employees. The fact that the formal entry charging the debts off the company's book did not come until Spring of the following. year—but at that, entered as of the close of 1960— cannot change the reality of the situation; namely, that the cancellation of these debts occurred in 1960. The government's selection of the year 1960 as the year of taxation is fully supported by the evidence.

In summary the court concludes that the taxpayers realized income in 1960 from the cancellation of their debts to the company in the amounts shown in the assessment, and that the taxpayers have failed to carry their burden of proving otherwise. Taxpayers are, however, due a partial refund for the dividends received credit which should have been, but was not, allowed to them on such income items. See footnote 7, *supra*. The amount of that refund [13] is as follows: to the Executors of Mrs. Ingalls' Estate, $1,797.69; to the surviving Trustees of the Robert I. Ingalls' Testamentary Trust #2, $7,541.31; each with interest from dates of payment respectively.

Judgment is to be entered accordingly upon the expiration of ten days from this memorandum,[14] each party to bear its own costs.

13. The refund is 4% of the increased dividend. The limits are factually inapplicable in both cases.

14. Much of the evidence tendered at the trial consisted of pleadings, orders and opinions from other cases. The court accepted these not as proof of the underlying facts, but as evidence of the positions taken therein and the results thereof. Recognizing the possibility that it might inadvertently rely on some such document as proof of the underlying matter recited therein, the court indicated at the close of the evidence that the parties would be given an opportunity to raise such objections before the opinion became final. The failure of either party to make such an exception within the next ten days is not, of course, to constitute any waiver of their right to appeal erroneous findings or conclusions by the court.