T.C. Memo. 1996-248


UNITED STATES TAX COURT


EDWARD B. ROOD, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 3366-94.                    Filed May 29, 1996.


Edward B. Rood, pro se.[*]

<u>Monica J. Howland</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


WELLS, <u>Judge</u>:  Respondent determined a deficiency of $60,457

in petitioner's 1988 Federal income tax.  The only issue

presented in the instant case is whether petitioner realized

---

[*]

    Brief amicus curiae was filed by <u>C. Kevin McGeehan</u> as
attorney for Caesar's World, Inc., and its subsidiaries.

income from the cancellation of an allegedly disputed gambling debt written off by a casino. Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts and the exhibits have been stipulated for trial pursuant to Rule 91. The parties' stipulations are incorporated herein by reference and are found accordingly.

During 1988 and when the petition in the instant case was filed, petitioner resided in Tampa, Florida.

Petitioner is an attorney who was recognized in 1991 for 50 years of membership in the Florida Bar. He is a former president of the Association of Trial Lawyers of America, the Tampa and Hillsborough County Bar Associations, the Florida Academy of Trial Lawyers, and the Junior Bar of the State of Florida.

Prior to 1985, petitioner maintained a line of credit at Caesar's Palace (Caesar's or the casino), a casino in Las Vegas, Nevada, where he gambled.

To draw on a line of credit, typically, a customer would sign the credit instrument given in exchange for chips (marker), in the gambling pit or at the cashier's cage in the casino. A marker could be presented to a customer's bank by the casino for payment in the same manner as a check. If a customer wished to allow another to gamble on the customer's credit, the customer

would sign the marker.  If the gambler won money gambling on credit, he or she would be asked to redeem the marker in the pit, if it were still there.  Otherwise, when the gambler sought to cash the chips won, the casino cashier would check to see whether there was a balance due for credit extended by the casino, and the gambler would be expected to apply the chips against the balance at that time.

When a payment is made on a customer's account at the casino cage, it is the casino's practice to give the payor a numbered receipt, a duplicate of which is kept in a receipt book and another duplicate of which is kept in the IOU envelope for the customer's account, in which Caesar's also files the customer's markers and correspondence.  It is also Caesar's practice to record all contacts with a customer concerning the account on the IOU envelope.  Receipts are consecutively numbered.  A payment made that did not appear to have been credited to a customer's account could be traced through the receipt book.

Petitioner incurred gambling debts at Caesar's.  On November 23, 1984, Caesar's extended $110,000 of credit to petitioner. Caesar's generally expected payment of the outstanding balance of petitioner's account at the end of one trip to the casino at the time of his next trip, holding the account up to 60 days.  During at least January, February, and March of 1985, Caesar's repeatedly contacted petitioner concerning payment of the debt, which Caesar's stated was due March 21, 1985.  Petitioner

informed Caesar's that he would pay the debt during his next trip to the casino. The debt was paid by cash and personal check on May 4, 1985. On May 5, 1985, Caesar's extended $110,000 of credit to petitioner. On that date, a payment of $80,000 was made by personal check. On May 6, 1985, Caesar's extended an additional $80,000 of credit to petitioner. On that date, a payment of $80,000 was made by personal check drawn on a business account. On May 7, 1985, Caesar's extended additional credit of $80,000 to petitioner. Caesar's also paid petitioner's airfare for the May 1985 trip.

On October 11, 1985, a payment of $110,000 was made on petitioner's account by personal check. On October 12, 1985, Caesar's extended credit of $85,000 to petitioner. On that date, a payment of $75,000 was made on petitioner's account by personal check. On October 13, 1985, Caesar's extended $240,000 of credit to petitioner. Caesar's paid petitioner's airfare for his October 1985 trip to the casino.

Beginning no later than November 1985, Caesar's repeatedly contacted petitioner concerning repayment of the amounts owed. During October, November, and December 1985, the $110,000 and $75,000 checks were deposited by Caesar's, returned, redeposited, and returned again because of either a missing endorsement or insufficient funds. Caesar's posted the check for $110,000 as returned on December 9, 1985, and the check for $75,000 as returned on December 10, 1985, and increased the balance owed by

petitioner from $250,000 to $435,000. That balance was attributable to credit extended by Caesar's prior to December 1985. When informed of the returns of the checks, petitioner promised to make arrangements to clear them and, subsequently, to send new checks. In the course of a contact with Caesar's concerning the returned check for $110,000, petitioner also inquired when the $250,000 balance of his account was due, and Caesar's informed him that it was due January 12, 1986. On December 23, 1985, Caesar's received a check for $110,000, which was returned due to insufficient funds on January 15, 1986.

During 1986, petitioner made the following payments on his account:

| Date | Amount |
|------|--------|
| May 13, 1986 | $25,000 |
| Aug. 11, 1986 | 10,000 |
| Dec. 3, 1986 | 10,000 |

The IOU envelope for petitioner's account sets forth the following notation with respect to a contact with petitioner on January 8, 1987: "Got him [petitioner] straight[en]ed out about 25M pmt [payment] which we rec back in 5/13/86--verified balance & pmts [payments] made & he agrees". Caesar's sent petitioner an account statement dated February 4, 1987, informing him that its executive committee had approved a lump-sum settlement in a reduced amount and inviting him to call its account representative for details. During 1987 and 1988, petitioner made payments on his account as follows:

| Date | Amount |
|------|--------|
| Apr. 2, 1987 | $5,000 |
| May 27, 1987 | 5,000 |
| July 16, 1987 | 5,000 |
| Aug. 22, 1987 | 5,000 |
| Oct. 27, 1987 | 5,000 |
| Dec. 29, 1987 | 5,000 |
| Mar. 13, 1988 | 5,000 |

In statements addressed to petitioner acknowledging receipt of the foregoing payments or setting forth the outstanding balance of his account, Caesar's requested that petitioner make monthly payments of between $5,000 and $10,000 to enable the casino to continue to hold his account and reminding him that its settlement offer was still open. In the statement dated March 15, 1988, Caesar's informed petitioner that it could not retain accounts indefinitely and that a 50-percent lump-sum settlement previously presented to petitioner was open to discussion.

By March 1988, $80,000 of petitioner's $435,000 debt to the casino had been repaid, leaving a balance of $355,000, according to the casino's records. A letter dated April 20, 1988, from Caesar's general counsel to petitioner stated that the casino required petitioner to pay his account in full immediately and that, if he did not contact Caesar's account representative within 15 days, the casino would turn petitioner's account over to a law firm or a collection agency to institute legal proceedings against him if necessary. The letter further stated that (1) any suit commenced against petitioner would be filed in

Nevada and (2) once judgment was obtained against petitioner, Caesar's would then have the judgment enforced against him by the courts of his home State. It was Caesar's usual practice to proceed in this manner in the event a lawsuit was instituted against a debtor.

A letter dated May 5, 1988, from Caesar's account representative to petitioner stated that the casino would accept a lump sum settlement of $142,000 in payment of petitioner's account, provided payment was made prior to June 5, 1988. Petitioner and the casino continued to negotiate a settlement after that offer. Petitioner subsequently signed an allowance receipt that was received by Caesar's on July 18, 1988, that requested $255,000 be written off his account balance to induce him to make payment on the account. In accordance with an agreement between Caesar's and petitioner, petitioner paid Caesar's $100,000 by check dated June 29, 1988, that was received by the casino on September 2, 1988.

Caesar's wrote off the $255,000 balance of petitioner's account in September 1988 and noted in its records that (1) no attempt should be made to collect that amount should petitioner return to the casino to gamble and (2) no credit would be extended to petitioner in the future due to the settlement.

Petitioner retained no records of his contacts with Caesar's concerning the repayment of his debts to the casino.

Petitioner was not insolvent during 1988.  Petitioner did not report the $255,000 written off by Caesar's as income from the cancellation of indebtedness on his 1988 Federal income tax return.

OPINION

Section 61(a)(12) provides the general rule that gross income includes income from the cancellation of indebtedness. The amount of the income includable generally is the difference between the face value of the debt and the amount paid in satisfaction of the debt.  Babin v. Commissioner, 23 F.3d 1032, 1034 (6th Cir. 1994), affg. T.C. Memo. 1992-673.  The income is recognized in the year cancellation occurs.  Montgomery v. Commissioner, 65 T.C. 511, 520 (1975).  A frequently cited rationale for the rule is that the cancellation results in an accession to income by effecting a freeing of assets previously offset by the liability arising from the indebtedness.  United States v. Kirby Lumber Co., 284 U.S. 1, 3 (1931); Cozzi v. Commissioner, 88 T.C. 435, 445 (1987).  If, however, the cancellation of all or part of a debt is made in settlement of a dispute concerning the debt, no income from cancellation of indebtedness arises.[1]  N. Sobel, Inc. v. Commissioner, 40 B.T.A.

---

[1]

We note that there is some question as to whether the disputed debt rule applies only to an unliquidated debt, i.e., one the amount of which is undetermined, regardless whether the debt is enforceable, Zarin v. Commissioner, 92 T.C. 1084, 1095-
(continued...)

1263, 1265 (1939); Exchange Sec. Bank v. United States, 345 F. Supp. 486, 490-491 (N.D. Ala. 1972), revd. on other grounds 492 F.2d 1096 (5th Cir. 1974); see also Colonial Sav. Association v. Commissioner, 85 T.C. 855, 862-863 (1985), affd. 854 F.2d 1001 (7th Cir. 1988). Settlement in such circumstances does not occasion a freeing of assets and accession to income. N. Sobel, Inc. v. Commissioner, supra at 1265. Petitioner bears the burden of showing that the settlement with Caesar's did not result in income from the cancellation of indebtedness. Rule 142(a).

Petitioner, relying on Zarin v. Commissioner, 916 F.2d 110 (3d Cir. 1990), revg. 92 T.C. 1084 (1989), claims that he disputed his debt to Caesar's, that his payments to Caesar's were in settlement of the dispute, and that therefore he realized no income upon the cancellation of the $255,000 that Caesar's claimed it was owed by petitioner.[2] Petitioner bases his argument upon certain facts alleged by him which respondent

---

[1](...continued)
1096 (1989), revd. 916 F.2d 110 (3d Cir. 1990), or whether the rule also applies where there is a dispute as to a debt's enforceability, Zarin v. Commissioner, 916 F.2d at 115-116. We need not address that question, however, because we hold below that petitioner has not carried his burden of proving that there was a dispute as to either the amount or the enforceability of his debt to Caesar's.

[2]
Petitioner does not argue that the settlement constituted a purchase price adjustment pursuant to sec. 108(e)(5). In Zarin v. Commissioner, 916 F.2d at 1097-1100, we concluded that sec. 108(e)(5) was inapplicable to the settlement of gambling debts, and that conclusion was not disturbed or criticized by the Court of Appeals for the Third Circuit.

disputes. Petitioner claims that during early December 1985, he hosted a charity golf tournament at Caesar's involving 12 players; that at a dinner on the evening before the tournament, he invited the players to gamble on his credit if they did not have credit with Caesar's; that several players obtained chips on his credit, including one who obtained $100,000 of such chips; that the players who gambled on petitioner's credit turned chips in to the casino cage, including the player who obtained the $100,000 of chips; and that the return of the chips was not reflected on petitioner's account by the casino employee in the cage. Petitioner contends that each player reported receiving a slip of paper when returning chips to the cage, but petitioner does not know what became of the receipts. Petitioner claims to have personally lost $80,000 gambling at Caesar's during the tournament.

Petitioner claims that, from the time Caesar's began attempting to collect from him, he had a "running telephone dispute" with Caesar's because of the foregoing events, but he neither put his claims in writing nor attempted to obtain statements from the tournament gamblers to prove his allegations to Caesar's.[3] Petitioner claims that Caesar's accepted his word. He claims to have dealt with Mr. Roy Jones, Caesar's casino

---

[3] Petitioner stated at trial that most of the players who had gambled on his credit were deceased.

collection manager, and that, after the tournament, he asked Mr. Jones to look into the absence of payment records.  Although petitioner states that he never heard specifically what had occurred at the cage, petitioner claims that Caesar's started to send him letters concerning settlement of his account soon thereafter.  Petitioner asserts that Caesar's must have known or thought it probable that a cage employee had mishandled the chips and that Caesar's settled for that reason.  Petitioner contends that he owed Caesar's only $180,000, the amount that he repaid, but petitioner offers no evidence that directly corroborates his testimony that he disputed his debt to Caesar's.  Petitioner, however, did offer the testimony of a witness who corroborated his version of some of the events occurring at the time of the golf tournament.

After considering the record in the instant case, however, we conclude that petitioner has not established the factual predicate for the alleged dispute between himself and Caesar's concerning the amount of his debt to the casino; namely, the use of his credit by others during December 1985 and the failure of the casino to record repayments by those persons.  The records of the casino in evidence concerning petitioner's account show that the extensions of credit that created the debts the casino sought to collect from petitioner occurred during May and October of

1985, not during December of that year as petitioner claims.[4] Because the records show that the casino made no additional extensions of credit to petitioner subsequent to October 1985, there is no support in those records for petitioner's contention that his indebtedness to the casino arose as a result of events occurring during early December 1985. Furthermore, petitioner does not claim that there was any dispute concerning his liability for or the amount of any of his debts to Caesar's that arose prior to December 1985.

Moreover, nothing in those records supports petitioner's contention that he incurred a debt to Caesar's of $80,000 during the December 1985 tournament due to gambling losses, which losses formed the basis for a portion of the debt that he acknowledged that he owed Caesar's. As noted above, Caesar's records show no new debt arising during December 1985. In light of petitioner's claims, we are nonplussed by the failure of those records to even indicate that petitioner made a trip to Caesar's during December

---

[4]
     The entries in the casino's records for December 1985 increasing the amount of petitioner's debt reflect the return of checks petitioner had given the casino during October 1985, and not the extension of new credit to petitioner. Petitioner maintains that those checks were paid but points to no evidence in the record to support that contention, and we have found none. Indeed, petitioner's contention that the returned checks were paid is contradicted by the entries in Caesar's records that show that, after one check for $110,000 was entered on Caesar's records as returned, a second check in that amount was sent to Caesar's, which was also returned.

1985. Thus, as far as Caesar's records are concerned, the payments made by petitioner were made with respect to liabilities arising in May and October 1985,[5] not during December 1985, as petitioner contends. Consequently, any events occurring with respect to the tournament that petitioner alleged took place during December 1985 did not affect the debt that Caesar's sought to collect from petitioner and which was the subject of the settlement between them.

Furthermore, there is nothing in the records that indicates that petitioner communicated to Caesar's his dispute concerning the amount of the debt on the grounds he advanced at trial. According to the testimony of the representative from Caesar's, it is Caesar's policy to record all contacts with a debtor on the IOU envelope for the debtor's account. The contacts recorded on the IOU envelope for petitioner's account do not contain any reference to any of the circumstances forming the basis of petitioner's alleged dispute with the casino. Instead, the contacts recorded on the IOU envelope simply chronicle the casino's inquiries as to when payments would be made and its difficulties with collecting payment from petitioner. One contact record dated January 8, 1987, notes that Caesar's verified with petitioner both the balance of petitioner's account

---

[5] Mr. Larry Gaddis, Caesar's assistant collection manager, testified that the records support this conclusion.

and the payments that had been made and that petitioner agreed with them. The contact record entry is evidence standing in direct contrast to petitioner's claim that he disputed the amount he owed the casino.

It seems likely that, if petitioner did not believe that he owed the full amount Caesar's claimed, he would have told one or more of the account representatives who contacted him and that his claim, which involved an allegation of serious wrongdoing by a casino employee, would have been noted on the IOU envelope during the more than 2-1/2 years that Caesar's attempted to collect the debt. Petitioner claims that, because the casino accepted his word on the matter, he made no effort to prove his claim concerning the repayments from the tournament gamblers by, for instance, obtaining statements from them or showing the casino the receipts they apparently received from the casino cage when chips were cashed. However, in the records of Caesar's that are in evidence, there is no indication of any such acceptance. Petitioner claims that neither he nor the casino wanted to put anything concerning the dispute in writing prior to the making of settlement offers, but petitioner offers no plausible explanation for such a desire.

Moreover, it seems to us that petitioner readily could have resolved any dispute by presenting the casino with evidence of payment, such as the receipts apparently received by the tournament gamblers, rather than conducting a "running telephone

dispute" with the casino that lasted over 2-1/2 years. Instead, petitioner testified that although the players received "slips of paper" when they returned chips to the cage, he did not "remember what happened to them or why they would have been important." In light of petitioner's legal background, we find curious petitioner's plea of ignorance as to the importance of such evidence as a matter of proof of his claim.

Petitioner also claimed to have dealt, by telephone, with Mr. Jones, Caesar's collection manager, and denied dealing with other Caesar's employees whose names appeared on casino correspondence with him.[6] However, the IOU envelope and Caesar's correspondence with petitioner indicate that petitioner dealt with a number of Caesar's employees, and there is nothing in the records of Caesar's contacts with petitioner that shows that petitioner informed Mr. Jones of any dispute with the casino. Accordingly, it seems that Mr. Jones' testimony would have been of value to petitioner in corroborating his claim. Petitioner did not call Mr. Jones to testify, claiming that he did not need

---

[6] Petitioner testified that, after the golf tournament, he asked Mr. Jones to look into whether a casino employee did not record repayments from the players. Petitioner testified that, while he did not hear specifically what Mr. Jones had learned, he did start receiving settlement offers soon thereafter. However, nothing in the records before us indicates that any investigation of such a matter was made. Furthermore, the records indicate that Caesar's did not begin attempting to settle petitioner's account for less than the balance due until February 1987, over a year after the alleged mishandling of petitioner's account occurred.

his testimony and that, in his experience as a lawyer, he had not been able to subpoena someone from as far away as Las Vegas to appear at a trial, which, in the instant case, was held in Tampa, Florida.[7]

The burden of proof is on petitioner, and we cannot assume that missing evidence would be favorable to him. Kamborian v. Commissioner, 56 T.C. 847, 869 (1971), affd. 469 F.2d 219 (1st Cir. 1972); Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968). Indeed, the usual inference is that the evidence would be unfavorable. Pollack v. Commissioner, supra at 108. While we do not go so far as to infer that Mr. Jones' testimony would have been unfavorable to petitioner,[8] petitioner must bear the consequences of his failure to call a witness who apparently could have corroborated his

---

[7]
It appears that petitioner could have obtained Mr. Jones' appearance by subpoena. Sec. 7456(a) provides for the subpoena of witnesses by the U.S. Tax Court from any place in the United States to appear at any designated place of hearing. Petitioner contacted Mr. Jones shortly before the trial of the instant case, and Mr. Jones was still employed by the casino then. Respondent subpoenaed an employee of Caesar's from Las Vegas who testified at trial.

[8]
It appears to us that Mr. Jones' relationship to petitioner was not such that he would ordinarily be expected to favor petitioner and that, therefore, he was equally available to both petitioner and respondent. Kean v. Commissioner, 469 F.2d 1183, 1188 (9th Cir. 1972), affg. in part and revg. in part 51 T.C. 337 (1968); McClanahan v. United States, 230 F.2d 919, 925 (5th Cir. 1956). In such a situation, no adverse inference is warranted. Kean v. Commissioner, supra at 1188.

claim given the circumstances discussed herein that cause the facts supporting his allegation that he disputed his debt to the casino to be in issue.

Petitioner contends that the casino's efforts to settle the debt were the result of its realization that a cage employee had mishandled chips and the difficulty of winning a suit against petitioner for collection of the amount it claimed he owed.[9] Petitioner points to nothing in any of the documents in the record that indicates that those considerations prompted Caesar's to settle with petitioner.[10] Mr. Larry Gaddis, the casino's assistant collection manager, who testified at trial, offered the following considerations that would have induced Caesar's to settle petitioner's account for less than the outstanding balance: (1) The age of and minimal payments that had been received on petitioner's account; (2) the cost of collecting the remaining balance of his account were a suit instituted against

---

[9] Petitioner also asserts that the casino failed to send his markers to his bank as required by law, a further circumstance that induced it to settle. The portions of the transcript on which petitioner relies for that assertion, however, do not support petitioner's contention. Petitioner does not contest the enforceability of his debt to Caesar's on any other grounds than those set forth herein.

[10] We have noted above that petitioner offered no plausible explanation for the casino's supposed reluctance to put anything in writing concerning the alleged dispute over petitioner's account other than its settlement offers.

petitioner; and (3) the benefit to the casino of receiving a lump sum in the amount of the settlement versus payments over a long period of time. Such considerations are not the result of concerns on the part of Caesar's as to the enforceability of petitioner's debt.[11]

Petitioner argues that the fact that the casino settled petitioner's debt indicates that the debt was disputed. We do not agree. As to petitioner's contention, we find useful the analysis in Exchange Sec. Bank v. United States, 345 F. Supp. at 491, which involved a cancellation of indebtedness resulting from the settlement of litigation to collect a debt. The District Court offered the following analysis of the effect of a

_____

[11]

Respondent claims that petitioner's debt to Caesar's was legally enforceable against him. It was Caesar's practice to obtain judgment against a debtor in the Nevada courts and then to have the judgment enforced against the debtor by the courts of the debtor's home State. A gaming debt evidenced by a credit instrument was legally enforceable pursuant to Nevada law when petitioner incurred his debt to Caesar's. Nev. Rev. Stat. secs. 463.367, 463.368(1) (1985). A judgment obtained in the Nevada courts would have been enforceable against petitioner in Florida pursuant to the Full Faith and Credit Clause of the U.S. Constitution, art. IV, sec. 1, notwithstanding that petitioner's debt to Caesar's would not have been enforceable pursuant to Florida law. Fauntleroy v. Lum, 210 U.S. 230, 237-238 (1908); Trauger v. A.J. Spagnol Lumber Co., 442 So. 2d 182, 183-184 (Fla. Dist. Ct. App. 1983); M & R Invs. Co. v. Hacker, 511 So. 2d 1099, 1100-1101 (Fla. Dist. Ct. App. 1987); GNLV Corp. v. Featherstone, 504 So. 2d 63 (Fla. Dist. Ct. App. 1987). Petitioner essentially conceded in his petition that, had Caesar's obtained a Nevada judgment against him, the judgment would have been legally enforceable against him in Florida. Petitioner, however, alleged that such circumstance was not relevant because Caesar's did not file suit against petitioner because of a "legitimate dispute concerning the amount due".

settlement that has been made for some of the reasons advanced by

Caesar's in the instant case:

> On the other hand * * * [the debtor] may actually
> owe the debt; and yet * * * [the creditor], confronted
> with a denial of liability, may be willing to settle,
> saving the time and expense of litigation, by accepting
> a much smaller payment than that actually owing.  Where
> there are serious problems of proof or of
> collectibility, or when * * * [the creditor] is
> confronted with unusual policy considerations, he may
> even be willing to dismiss the suit without any
> payment.  In such situations it seems clear that * * *
> [the debtor] would thereby realize cancellation of
> indebtedness income subject to the "insolvency" and
> "gift" exceptions.[12]
>
> The conclusion which must be reached is that the
> settlement of a disputed debt may or may not result in
> cancellation-type income.  The institution of a
> collection suit by a purported creditor does not
> establish that a debt exists or has existed, but
> essentially is only evidence that the plaintiff so
> contends; likewise, a defendant's denial of liability
> does not establish that a debt does not exist or is no
> longer enforceable, but essentially is only evidence
> that the purported debtor so contends.  The terms of
> the agreement settling the litigation are of probative

---

[12]

Neither exception is relevant in the instant case.
Petitioner was not insolvent during 1988, nor has he established
any donative intent on the part of Caesar's in settling his debt.
Moreover, although there is no express abolition of the gift
exception in sec. 108, the legislative history of the Bankruptcy
Tax Act of 1980, Pub. L. 96-589, 94 Stat. 3389, which amended
sec. 108, states, in the course of discussing provisions relating
to the realization of cancellation of indebtedness income arising
from contributions by a shareholder of debt to the capital of a
corporation, that "it is intended that there will not be any gift
exception in a commercial context (such as a shareholder-
corporation relationship) to the general rule that income is
realized on the discharge of indebtedness".  H. Rept. 96-833, at
15 n.21 (1980); S. Rept. 96-1035, at 19 n.22 (1980), 1980-2 C.B.
620, 629.  Consequently, there is at least a question whether the
gift exception continues to be applicable to commercial
transactions, such as the one in issue in the instant case.

value (though not conclusive) in determining the
relative merits of the two parties' positions--for
example, the payment of no or only nominal
consideration by the purported debtor tends to support
the conclusion that at least one of its defenses is
well taken.  [Id.[13]].

Consequently, although, given the fact that Caesar's settled
with petitioner, one might infer the existence of a dispute
concerning the debt, and the amount of the settlement might be an
indicator of the relative merits of their respective positions,
such circumstances are not conclusive of whether a debt is
disputed in good faith for purposes of deciding whether or not a
debtor has realized income from the cancellation of indebtedness

---

[13]

The court in Exchange Sec. Bank v. United States, 345 F.
Supp. 486, 491 (N.D. Ala. 1972), revd. on other grounds 492 F.2d
1096 (5th Cir. 1974), also stated that "the trial court in a tax
case involving alleged cancellation-type income must, it appears,
determine the underlying, critical facts, e.g., the actual amount
(if any) of the debt."  We note that, in Zarin v. Commissioner,
916 F.2d at 115-116, the Court of Appeals for the Third Circuit
held that a good faith dispute between a lender and borrower
would cause a settlement not to give rise to an accession to
income from cancellation of indebtedness.  The Board of Tax
Appeals also found that settlement of a dispute concerning a debt
did not give rise to income from the cancellation of indebtedness
where litigation concerning the taxpayer's liability was bona
fide, and, because of the settlement of the litigation, it could
not be said whether or not the litigation would have established
the liability.  N. Sobel, Inc. v. Commissioner, 40 B.T.A. 1263,
1265 (1939).  Thus, the Board seems to have adopted a similar
standard in deciding whether the disputed debt rule applies to a
settlement.
	Notwithstanding the correct standard to be applied, however,
petitioner cannot prevail because he has not established either
that the actual amount of his debt was less than the amount
Caesar's claimed that he owed or that there was a good faith
dispute concerning the amount.

as a result of the settlement.[14]  If a settlement alone were
sufficient to establish the disputed nature of a debt, a taxpayer
whose liability for the full amount of a settled debt was not in
question would reap a windfall in the form of an untaxed freeing
of the assets previously offset by the liability represented by
the debt.  In contrast, in the case of a settlement of a truly
disputed debt, the settlement does not give rise to an accession
to income due to the freeing of the debtor's assets because the
amount of the assets that were offset by the debt is not clear.

In the instant case, there is no direct evidence other than
petitioner's testimony that he disputed his debt to Caesar's
prior to the institution of proceedings in the instant case.
Although petitioner contends that his testimony concerning his
dealings with the casino was uncontradicted, we need not accept
such testimony at face value where it is improbable,
unreasonable, or questionable.  Quock Ting v. United States, 140
U.S. 417 (1891); Archer v. Commissioner, 227 F.2d 270, 273 (5th
Cir. 1955), affg. a Memorandum Opinion of this Court dated
February 18, 1954.  We find the evidence supporting and refuting
petitioner's claim concerning the alleged dispute with Caesar's,

---

[14]
We conclude, based on the record, that petitioner has not
established the existence of any dispute concerning the
enforceability of his debt to Caesar's on any of the grounds
alleged by him.  The issue as to the enforceability of a debt,
which was a factor considered by the Court of Appeals for the
Third Circuit in Zarin v. Commissioner, 916 F.2d at 115-116, is
accordingly not present in the instant case.

at best, to be in equipoise, a state which is insufficient to carry petitioner's burden of proof.[15]

Accordingly, we hold that petitioner has not established by a preponderance of the evidence that the settlement of his account with Caesar's was of a disputed debt. Consequently, we further hold that petitioner realized income from the cancellation of indebtedness in the amount of the balance of that account written off by Caesar's; to wit, $255,000.[16]

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.

---

[15]

Although petitioner did introduce the testimony of a witness besides himself concerning some of the events surrounding the golf tournament, the record establishes that the extensions of credit which gave rise to the debt Caesar's sought to collect arose before the events of December 1985 concerning which the witness testified. Moreover, petitioner's witness did not testify concerning petitioner's later dealings with Caesar's concerning the collection of the debt.

[16]

By order, we permitted Caesar's World, Inc., to file a brief amicus curiae but limited the arguments in the amicus brief to the issues presented by the parties at trial and the evidence in the record. The sole issue presented by petitioner at trial was whether the settlement of his account with Caesar's was of a disputed debt. The amicus brief, however, raises issues not presented by the parties at trial, and respondent claims to be surprised and prejudiced by the raising of those issues. We have disregarded the portions of the amicus brief that do not conform to our order limiting the arguments therein to those presented by the parties at trial.